473 A.2d 12

COUNTY COMMISSIONERS OF CHARLES
COUNTY, Maryland

v.

Albert W. STEVENS, t/a A.W. Stevens & Sons.

No. 94, Sept. Term, 1983.

Court of Appeals of Maryland.

April 4, 1984.

Thomas C. Hayden, Jr., County Atty., La Plata, for appellant.

Stephen H. Sachs, Atty. Gen., Dorothy A. Beatty and Pamela D. Andersen, Asst. Attys. Gen., Baltimore, on brief, amici curiae for State of Maryland, Maryland Environmental Service.

Thomas P. Smith, County Atty., Michael O. Connaughton, Deputy Co. Atty., Steven M. Gilbert and John T. Beamer, II, Associate County Attys., Upper Marlboro, on brief, amicus curiae for Prince George's County, Maryland.

Kathryn J. Dahl, Annapolis (Blumenthal, Delavan, Offutt & Moodispaw, P.A., Annapolis, on brief), for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ., and CHARLES E. ORTH, Jr., retired, Specially Assigned Judge.

MURPHY, Chief Judge.

We granted certiorari to determine whether a regulation banning disposal, in a county owned and operated landfill facility, of solid waste originating outside the county's borders violates the Commerce Clause of the United States Constitution.[1]

---

1. Our grant of certiorari was prior to consideration of the appeal by the Court of Special Appeals. *See* Maryland Code (1980 Repl.Vol.), § 12–201 of the Courts and Judicial Proceedings Article.

## I.

The County Commissioners of Charles County own and operate a sanitary landfill in Pisgah, Charles County, Maryland. The purpose of the facility is to provide for the disposal of solid waste generated by Charles County residents. The landfill is part of the County's Solid Waste Plan developed to comply with the requirements of Maryland Code (1982), § 9–501, *et seq.* of the Health-Environmental Article. Charles County is expressly authorized by Code (1957, 1981 Repl.Vol.), Art. 25, § 14A to construct landfills and "to prescribe and enforce rules and regulations concerning the operation and manner of use of the disposal areas or facilities."

The Pisgah facility is the only sanitary landfill in Charles County. It consists of eighty-seven acres of land with a suitable soil base, an asphalt road offering access to a public road, weight scales, record keeping facilities and the heavy equipment necessary to provide daily soil cover. Commercial haulers must obtain a permit and pay a fee for using the landfill. Noncommercial trucks and utility trailers are also charged a fee. Individuals hauling waste in any other vehicle may use the landfill without charge. The landfill's operation is primarily funded from County tax revenues.

Pursuant to its statutory authority, the County Commissioners adopted "Regulations Governing the Use of Charles County Public Trash Disposal Areas." Regulation 4(d) provides:

"No garbage, trash, or refuse collected outside the territorial limits of Charles County shall be disposed of in any *Public* Trash Disposal Area of Charles County." (Emphasis supplied.)

The regulation, on its face, governs only public landfills; it has no application to any privately owned facility.

Albert W. Stevens operates a solid waste hauling business within and beyond the territorial limits of Charles County. Stevens' trucks have dumped refuse which was collected outside of Charles County at the Pisgah facility. The Coun-

ty suspended one of Stevens' permits for violating Regulation 4(d). As a result, Stevens filed a Bill of Complaint in the Circuit Court for Charles County seeking a declaration that Regulation 4(d) was unconstitutional under the Commerce, Equal Protection and Due Process Clauses of the federal constitution and under Article 24 of the Maryland Declaration of Rights. Stevens also sought an injunction barring enforcement of the regulation.

None of the material facts being in dispute, both the County and Stevens moved for summary judgment. The court (Bowling, J.) granted Stevens' motion, concluding that Regulation 4(d) unconstitutionally discriminated against interstate commerce in violation of the Commerce Clause of the federal constitution. Relying on *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Browning-Ferris v. Anne Arundel Co.*, 292 Md. 136, 438 A.2d 269 (1981); and *Shayne Bros., Inc. v. Prince George's County, Md.*, 556 F.Supp. 182 (D.Md.1983), the court reasoned that

"The regulation is basically an economic protectionist measure, which places a direct burden on interstate commerce. The Court has found no legitimate local purpose that would justify such a restriction."

The court rejected the County's argument that "a regulation limiting access to a publicly-owned landfill should be subjected to a lesser degree of constitutional scrutiny than a regulation dealing with privately-owned sites." It concluded that Regulation 4(d), even though limited to public landfills, "is invalid because it overtly discriminates against articles in interstate commerce." The County appealed from the lower court's declaratory decree, arguing that it could, consistent with the Commerce Clause, legally prohibit the disposal of solid waste originating outside of the County at its Pisgah landfill facility.

## II.

The Commerce Clause of the United States Constitution, art. I, § 8, cl. 3, performs a dual function. *See*

*Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). By its express terms, it is a source of Congress' power "To regulate Commerce with foreign Nations, and among the several States . . . ." It also acts as a limitation on the power of states to pass regulations and impose taxes that affect interstate commerce. *Id.* at 326, 99 S.Ct. at 1731. In this latter role, the negative implications of the clause have been referred to as the "dormant"[2] or "negative"[3] commerce clause. The dormant commerce clause limitations apply with equal force to all laws and regulations that affect interstate commerce whether at the state, county or municipal level. *Huron Portland Cement Co. v. City of Detroit, Michigan,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); *Browning-Ferris, supra,* 292 Md. at 142 n. 4, 438 A.2d 269.

■ The decisions of the United States Supreme Court have developed a two part dormant commerce clause analysis. Nondiscriminatory laws and regulations which burden the flow of interstate commerce are subjected to a balancing test:

"Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). But where it is shown that a state or local law or regulation discriminates against interstate commerce in favor of local interests, "the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local in-

---

**2.** *See, e.g., White v. Massachusetts Council of Const. Employers,* 460 U.S. 204, 212, 103 S.Ct. 1042, 1047, 75 L.Ed.2d 1 (1983).

**3.** *See* Blumstein, *Some Intersections of the Negative Commerce Clause and the New Federalism: The Case of Discriminatory State Income Tax Treatment of Out-of-State Tax Exempt Bonds,* 31 Vand. L.Rev. 473 (1978).

terests at stake." *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). Thus, as stated in *Philadelphia v. New Jersey, supra,* 437 U.S. at 624, 98 S.Ct. at 2535, "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected ... [, the clearest example of which] is a law that overtly blocks the flow of interstate commerce at a State's borders." (Citations omitted.)

At issue in *Philadelphia v. New Jersey, supra,* was a statute which made it illegal to dump solid waste originating outside of New Jersey in any landfill within the state. Thus, the statute applied with equal force both to publicly and privately owned landfills. Private New Jersey landfill operators as well as several cities in neighboring states challenged the constitutionality of the law on commerce clause grounds.

Initially, the Supreme Court rejected the state court's holding that the definition of "commerce" for purposes of the dormant commerce clause is much narrower than the scope of that term when used as a source of congressional power. The Court held that restrictions on the interstate transportation of waste were subject to the same level of constitutional scrutiny as restrictions on commerce in other products. *Id.* at 622–23, 98 S.Ct. at 2534–35. The Court stated that although the statute may have been enacted to further legitimate environmental policies, these goals

> "may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently. Both on its face and in its plain effect [the law] violates this principle of nondiscrimination." *Id.* at 626–27, 98 S.Ct. at 2537.

The Court's decision stands for the proposition that a state may not close its borders to waste from other states while permitting unrestricted disposal of refuse generated in the state. The Court said that "it may be assumed as well that New Jersey may pursue [its environmental goals] by slowing

the flow of *all* waste into the State's remaining landfills, even though interstate commerce may incidentally be affected." (Emphasis in original.) *Id.* at 626, 98 S.Ct. at 2537. The Court continued:

> "Also relevant here are the Court's decisions holding that a State may not accord its own inhabitants a preferred right of access over consumers in other States to natural resources located within its borders. *West v. Kansas Natural Gas Co.,* 221 U.S. 229 [, 31 S.Ct. 564, 55 L.Ed. 716 (1911)]; *Pennsylvania v. West Virginia,* 262 U.S. 553 [, 43 S.Ct. 658, 67 L.Ed. 1117 (1923)]. These cases stand for the basic principle that a 'State is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the State.'"

*Id.* at 627, 98 S.Ct. at 2537 (quoting *Foster Packing Co. v. Haydel,* 278 U.S. 1, 10, 49 S.Ct. 1, 3–4, 73 L.Ed. 147 (1928)). In footnote six, the Court reserved the question whether a state might constitutionally exclude out-of-state waste from publicly owned landfill sites.

> "We express no opinion about New Jersey's power, consistent with the Commerce Clause, to restrict to state residents access to state-owned resources ...; or New Jersey's power to spend state funds solely on behalf of state residents and businesses ...." (Citations omitted.)

*Id.* 437 U.S. at 627 n. 6, 98 S.Ct. at 2537 n. 6. The issue before us today is the one left unanswered in footnote six of *Philadelphia v. New Jersey, supra.*

In *Browning-Ferris, supra,* we reviewed the constitutionality of an Anne Arundel County ordinance which prohibited, *inter alia,* the disposal in or transportation through the county of any hazardous waste originating outside the county. The lower court declared this portion of the law unconstitutional as a violation of the Commerce Clause. Relying on *Philadelphia v. New Jersey,* we affirmed. Judge Eldridge, writing for the Court, said:

"It is obvious that § 11–408(g)(1)(ii) of the Anne Arundel County Code does exactly what is forbidden by *Philadelphia v. New Jersey.* The ordinance, while permitting transportation and disposal of hazardous waste under certain conditions if the waste originates within the county, nonetheless closes down the county's borders to all of those who would either transport or dispose of wastes originating from outside the county. Thus the ordinance overtly discriminates against articles in interstate commerce. Since no reason has been advanced for treating out-of-county wastes differently from in-county wastes, apart from their origin, we hold that § 11–408(g)(1)(ii) is void under *Philadelphia v. New Jersey, supra,* as impermissibly discriminating against articles in interstate commerce."

292 Md. at 142, 438 A.2d 269 (footnotes omitted). It must be emphasized that, like the law struck down in *Philadelphia v. New Jersey,* the county ordinance applied both to public and to private disposal facilities.

In *Shayne Bros., supra,* two private haulers of solid waste doing business in interstate commerce challenged the constitutionality of a Prince George's County ordinance which prohibited the transportation of waste from outside the state to *any* dump or landfill within the county. There were only two landfills in the county, one county-owned and operated, and the other owned by the Maryland National Capital Park and Planning Commission and operated by a private commercial concern under contract with the Commission. The court ruled that the ordinance was indistinguishable from that invalidated by *Philadelphia v. New Jersey;* it said that it unconstitutionally discriminated against interstate commerce. 556 F.Supp. at 185. The court rejected the county's reliance on footnote six in *Philadelphia v. New Jersey,* stating that the ordinance

"does not limit its restrictions to state-owned resources. The prohibition in this Ordinance applies on its face to all dumps or landfills within the County, whether privately owned or County-owned." *Id.* at 186.

In each of these three cases, the law challenged was a regulation applying to all landfills located within the jurisdiction. The constitutionality of a restriction imposed only on publicly owned and funded landfills was not considered. Consequently, these cases do not provide an adequate resolution of the issue before us today.

## III.

In *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), the Supreme Court announced a complete exemption from dormant commerce clause restrictions for governments acting as market participants rather than market regulators. The law challenged in that case was a Maryland statute designed to encourage the removal of abandoned automobiles from state roadsides by paying subsidies to scrap processors. In order to collect the subsidy, the law required out-of-state scrap processors to provide more extensive documentation than that demanded of Maryland processors. The more onerous documentation requirements encouraged wreckers to take cars to Maryland processors rather than to processors located in other states. A Virginia processor challenged the statute's constitutionality on Commerce Clause grounds.

In upholding the law, the Supreme Court acknowledged that the subsidy program, as it operated under the statute, placed a burden on the flow of interstate commerce. Nevertheless, it said that Maryland's subsidy program was not the kind of governmental activity the dormant commerce clause was designed to cover. *Id.* at 805, 96 S.Ct. at 2495–96. The Court distinguished this case from its prior decisions where states had "interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation." *Id.* at 806, 96 S.Ct. at 2496. By contrast, it said, Maryland had entered the market to bid up the price paid to Maryland processors and wreckers. The Court concluded that "[n]othing in the purposes animating the Commerce Clause prohibits a State . . . from participating in the market and exercising the right to favor its own

citizens over others." (Footnotes omitted.) *Id.* at 810, 96 S.Ct. at 2498.

In *Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), the Court addressed the issue whether a state could constitutionally give a preference to state residents in the allocation of cement manufactured at a state-owned cement plant. In 1919, South Dakota built a cement plant to ease a regional cement shortage. For many years the plant produced more cement than South Dakota residents could use and sold the excess to out-of-state customers including the plaintiff, Reeves. In 1978, however, the plant found itself unable to satisfy the demand for its product and began to enforce a long existing policy of giving preference to South Dakota residents. Reeves was unable to obtain an adequate supply of cement from the state plant and challenged the state's policy.

The Court found that South Dakota was acting as a market participant and not as a market regulator. Consequently, the Court held, the state's policy of preferring its residents was not subject to dormant commerce clause scrutiny. It stated:

"The basic distinction drawn in *Alexandria Scrap* between States as market participants and States as market regulators makes good sense and sound law. As that case explains, the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace.... There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market."

*Id.* at 436–37, 100 S.Ct. at 2277 (citations omitted). The Court rejected Reeves' argument that the preference policy was per se invalid under the analysis of *Philadelphia v. New Jersey, supra.* The Court said:

"We find the label 'protectionism' of little help in this context. The State's refusal to sell to buyers other than South Dakotans is 'protectionist' only in the sense that it limits benefits generated by a state program to those who

fund the state treasury and whom the State was created to serve. Petitioner's argument apparently also would characterize as 'protectionist' rules restricting to state residents the enjoyment of state educational institutions, energy generated by a state-run plant, police and fire protection, and agricultural improvement and business development programs. Such policies, while perhaps 'protectionist' in a loose sense, reflect the essential and patently unobjectionable purpose of state government—to serve the citizens of the State."

*Reeves,* 447 U.S. at 442, 100 S.Ct. at 2280 (footnote omitted). The Court noted that the statute "challenged in *Alexandria Scrap* was motivated by the same concern underlying South Dakota's resident-preference policy—a desire to channel state benefits to the residents of the State supplying them." *Id.* at 443 n. 16, 100 S.Ct. at 2280 n. 16. The Court rejected the notion that extension of the *Alexandria Scrap* exemption to cover the cement plant would permit the state to hoard the natural resources found within its borders. The Court said:

> "This argument, although rooted in the core purpose of the Commerce Clause, does not fit the present facts. Cement is not a natural resource, like coal, timber, wild game, or minerals."

*Id.* at 443–44, 100 S.Ct. at 2281. Furthermore, the Court noted, South Dakota has not limited access to the materials used to make cement nor barred others from building cement plants in the state.

> "Moreover, petitioner has not suggested that South Dakota possesses unique access to the materials needed to produce cement. Whatever limits might exist on a State's ability to invoke the *Alexandria Scrap* exemption to hoard resources which by happen-stance are found there, those limits do not apply here."

*Id.* at 444, 100 S.Ct. at 2281 (footnote omitted). Therefore, the Court found no reason to depart from the rule enunciated in *Alexandria Scrap.*

In its most recent decision on the subject, the Court upheld the constitutionality of an executive order issued by the Mayor of Boston requiring that on all city-funded construction projects the work must be performed by a work force at least half of which is composed of city residents. *White v. Massachusetts Council of Const. Employers,* —— U.S. ——, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). The Court held that the executive order did not violate the Commerce Clause. It said:

> "Insofar as the city expended only its own funds in entering into construction contracts for public projects, it was a market participant and entitled to be treated as such under the rule of *Hughes v. Alexandria Scrap Corp.* . . . ."

*Id.* —— U.S. at ——, 103 S.Ct. at 1048.[4]

### IV.

■ Charles County advances three arguments for reversal of the lower court's holding that Regulation 4(d) violated

---

**4.** The reported cases of other jurisdictions further define the scope of the market participant exemption. In the following cases, the state was exempt from Commerce Clause restrictions because it was acting as a market participant: *Transport Limo. v. Port Auth. of New York,* 571 F.Supp. 576 (E.D.N.Y.1983) (Port Authority is a market participant in furnishing facilities to ground transport companies at Kennedy and LaGuardia airports); *Fidelity Guar. Mortg. v. Conn. Hous. Finance Auth.,* 532 F.Supp. 81 (D.Conn.1982) (state agency financing low interest mortgages through the sale of tax free bonds is a market participant); *United Bldg. & Constr. Trades Council v. Camden,* 88 N.J. 317, 443 A.2d 148 (1982), *rev'd on other grounds,* —— U.S. ——, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (Camden City ordinance requiring that at least 40% of each public works work force be composed of Camden City residents does not violate the dormant commerce clause). Where restrictions extend to all transactions in goods or services among private parties, however, the government is not protected by the market participant exemption. Consequently, regulations governing *all* trade in an article of interstate commerce are subject to commerce clause scrutiny. *See Washington State Bldg. & Const. Trades v. Spellman,* 684 F.2d 627 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) (ballot initiative banning storage of radioactive waste generated out of state and transportation of such waste to disposal sites within the state); *Smith v. Department of Agr. of State of Ga.,* 630

the Commerce Clause. First, the County argues that the regulation does not place an unreasonable burden on interstate commerce under the balancing test set forth in *Pike v. Bruce Church, Inc., supra.* Second, the County claims that it is operating the Pisgah landfill as a market participant, rather than as a market regulator, and as a consequence, the dormant commerce clause does not apply to its activities. Third, the County suggests that the operation of the landfill is a "traditional governmental function" within the meaning of *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and thus precludes congressional regulation of the landfill under the commerce power. Because we find that Charles County is acting as a market participant, it is unnecessary to address the County's other arguments.

The market in which the County participates in the operation of the Pisgah landfill is not waste. The County neither buys nor sells refuse deposited in its landfill. Rather, it provides a service to Stevens and the other private waste haulers, *i.e.,* for a fee, the County accepts the waste they have collected, compacts it and covers it with soil so that its final disposal complies with all applicable environmental and health laws. Therefore, for purposes of the market participant analysis in this case, the market is landfill services.

Solid waste haulers in Maryland may dump solid waste

---

F.2d 1081 (5th Cir.1981), *cert. denied,* 452 U.S. 910, 101 S.Ct. 3040, 69 L.Ed.2d 412 (1981) (regulation of a state-owned produce market); *Tenneco, Inc. v. Sutton,* 530 F.Supp. 411 (M.D.La.1981) (statute giving Louisiana residents a preferred right of access to all natural gas produced in the state); *Archer Daniels Midland Co. v. State,* 315 N.W.2d 597 (Minn.1982) (reduced tax on gasohol if blended with alcohol refined in-state from agricultural products grown in the state). *But see South-Central Timber Development, Inc. v. LeResche,* 511 F.Supp. 139 (D.Alaska 1981), *rev'd on other grounds,* 693 F.2d 890 (9th Cir.1982), *cert. granted,* —— U.S. ——, 104 S.Ct. 231, 78 L.Ed.2d 224 (1983) (timber is a natural resource under *Reeves* and therefore the state is not a market participant when it requires that timber removed from state-owned land be processed in-state prior to shipment in interstate commerce).

only in authorized landfills.[5] The haulers must either construct their own landfill or pay for the use of one operated by another. Charles County has constructed a landfill to accommodate the waste generated in the County. Regulation 4(d) does nothing more than limit the benefits of this service to the County taxpayers who pay for it. The regulation applies only to one participant in the market—the Pisgah facility. It does not restrict the disposal of waste collected outside of Charles County in any other landfill that might be constructed within the County. Neither Regulation 4(d) nor any other state or county law or regulation would prohibit Stevens or others from purchasing land in Charles County and constructing a landfill.[6]

We are unpersuaded by Stevens' argument that the County is not a market participant but rather is a market regulator. Stevens contends that in *Alexandria Scrap,* the state "created a market in hulks" whereas in this case, the waste "exists and is moving in interstate commerce without the creation of or aid of Charles County." An identical argument was rejected in *Reeves,* the Supreme Court there noting "that *Alexandria Scrap* could not, and did not, rest on the notion that Maryland had created the interstate market in hulks." *Reeves, supra,* 447 U.S. at 446 n. 18, 100 S.Ct. at 2282 n. 18.

■ Moreover, Stevens' reliance on *Smith v. Department of Agr. of State of Ga.,* 630 F.2d 1081 (5th Cir.1980), *cert.*

---

**5.** Regulations promulgated pursuant to § 9–204 of the Health-Environmental Article govern the disposal of solid waste. Dumping of waste not generated on the property is prohibited unless a permit to operate a landfill is obtained. COMAR § 10.17.11.03B(1) and (3). Authorized landfills must meet certain specifications and provide for compaction and daily soil cover. COMAR § 10.17.11.04.

**6.** The Zoning Ordinance for Charles County, Maryland, permits the operation of sanitary landfills in industrial zones. Article XIV, § A17. Landfills also may be constructed in any of the following zones if a Special Exception is first obtained: R–1 Suburban High-Density, art. V, § B22; R–2 Suburban Medium-Density, art. IV, § B1; R–3 Rural-Agricultural, art. III, § B22; R–15 Urban Medium-Density, art. VII, § B1; and R–30 Urban Low-Density, art. VI, § B15.

*denied,* 452 U.S. 910, 101 S.Ct. 3040, 69 L.Ed.2d 412 (1981), is also misplaced. That case involved a challenge to certain leasing practices at the Columbus (Georgia) Farmers Market, a facility owned by the state and funded partly with state tax revenues. Selling areas were rented by farmers from Georgia and the surrounding states who in turn sold their produce directly to the public. The state gave Georgia farmers preferred access to the commercially more desirable selling areas and relegated vendors from other states to less advantageous locations. The court held that the state was not a market participant and consequently that the preference given to state residents violated the dormant commerce clause. The court described the state's role "as a hybrid one." 630 F.2d at 1083.

> "[I]t is significant that appellants neither produce the goods to be sold at the market, nor engage in the actual buying or selling of those goods. In essence, the State of Georgia has simply provided a suitable marketplace for the buying and selling of privately owned goods.... Accordingly, the State of Georgia cannot be deemed an actual market participant at the Columbus Farmers Market. Rather, its essential role is that of market regulator."

*Id.* As the concurring opinion indicates, the key to the court's opinion is its implicit definition of the market as "produce sales." *Id.* at 1086. As such, *Smith* is clearly distinguishable. In the instant case, as earlier observed, the market is not waste; rather, it is landfill services.[7] Because

---

7. In his dissenting opinion in *Smith,* Judge Randall criticized the majority's market definition. He observed that Georgia has not attempted to regulate the interstate sale of produce. On the contrary, the dissent said that the state entered the market for the provision of physical marketplaces. As such, it continues, the state acted as a market participant for these physical marketplaces and was exempt from Commerce Clause scrutiny. We note that at least one commentator has concluded that the dissent in *Smith* reached a better result. Varat, *State "Citizenship" and Interstate Equality,* 48 U.Chi.L.Rev. 487, 507 n. 84 (1981).

Regulation 4(d) applies only to one participant in that market, it does not offend the dormant commerce clause.

Finally, Stevens argues that the market participant exemption does not apply in this case because under *Philadelphia v. New Jersey* landfills are a natural resource. He argues that *Reeves* prohibits a state from hoarding natural resources it owns under the assertion that, for dormant commerce clause purposes, it is a market participant. Stevens says that *Reeves* created an exception to the market participant exemption for the sale of state-owned natural resources.

 Whatever the extent of any natural resources exception to the market participant rule in *Alexandria Scrap,* it would not apply here because the Pisgah facility is not a natural resource. In *Philadelphia v. New Jersey,* the law struck down by the Court limited access to all publicly and privately owned land located in the state upon which landfills could be constructed. As the Court there said, the New Jersey law "imposes on out-of-state commercial interests the full burden of conserving the State's remaining *landfill space."* *Id.,* 437 U.S. at 628, 98 S.Ct. at 2537 (emphasis added). It was in this context that the Court implied that landfill sites were natural resources. As support for this proposition, the Court referred to earlier holdings that states may not prohibit nonresident access to *privately owned* resources found within the state, *viz. Oklahoma v. Kansas Nat. Gas Co.,* 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911) (natural gas); *Penna. v. West Virginia,* 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) (natural gas); and *Foster Packing Co. v. Haydel,* 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928) (shrimp). Assuming that land suitable for landfills would be a natural resource which a state would not be permitted to hoard, *see Baldwin v. Montana Fish and Game Comm'n,* 436 U.S. 371, 385–86, 98 S.Ct. 1852, 1861–62, 56 L.Ed.2d 354 (1978), Charles County is not attempting to hoard land located within its territorial limits; rather, it is preserving for its residents the benefits from a service

provided by a costly facility constructed and operated with tax revenues collected from its own citizens.[8] The service provided by the Pisgah landfill "is the end product of a complex process whereby a costly physical plant and human labor act on raw materials." *Reeves,* 447 U.S. at 444, 100 S.Ct. at 2281. *See also New England Power Co. v. New Hampshire,* 455 U.S. 331, 338–39 n. 6, 102 S.Ct. 1096, 1100 n. 6, 71 L.Ed.2d 188 (1982) ("a State may confine to its residents the sale of products it *produces*") (emphasis in the original); *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 957, 102 S.Ct. 3456, 3465, 73 L.Ed.2d 1254 (1982) (where goods are "publicly produced and owned, . . . a state may favor its own citizens in times of shortage"). The County has not closed its borders to anyone who wishes to construct landfills within the County. *See Reeves, supra,* 447 U.S. at 444, 100 S.Ct. at 2281.[9] Nor has it been shown that the County possesses unique access to potential landfill sites.[10] In short, none of the reservations expressed in *Reeves* con-

---

**8.** We recognize, however, that states and their political subdivisions do not have unlimited power to exclude nonresidents from state-owned facilities. For example, a state could not bar nonresidents from state roads solely because the roads are built and maintained and therefore "owned" by the state. *Buck v. Kuykendall,* 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925).

**9.** The Court in *Reeves* noted:
"South Dakota has not sought to limit access to the State's limestone or other materials used to make cement. Nor has it restricted the ability of private firms or sister States to set up plants within its borders."
447 U.S. at 444, 100 S.Ct. at 2281.

**10.** In *Reeves,* the Court implied that a natural or acquired monopoly over state-owned natural resources found fortuitously within its boundaries would not be eligible for the market participant exemption. There, the Court noted:
"Moreover, petitioner has not suggested that South Dakota possesses unique access to the materials needed to produce cement." 447 U.S. at 444, 100 S.Ct. at 2281 (footnote omitted). In this regard, *see* Varat, *supra,* note 17 at 557. Although it is true that, at this time, the County operates the only landfill within its borders, there is no indication that it is immune from competition from potential market entrants.

cerning the application of the *Alexandria Scrap* exemption to natural resources dictate a different outcome in this case.

## V.

The result we reach makes good sense and sound policy. It gives effect to the rather unremarkable and "patently unobjectionable" proposition that a state may limit "benefits generated by a state program to those who fund the state treasury and whom the State was created to serve." *Reeves, supra,* 447 U.S. at 442, 100 S.Ct. at 2280. Regulation 4(d) ensures that the Pisgah landfill and the service provided there will be reserved for those who have paid to construct and operate the facility. It merely prevents those who generate waste outside of Charles County from having access to a facility for which they made no payment. In this sense, Regulation 4(d) is no different from a county rule reserving its public schools for county residents. As the Court said in *Reeves,* the Commerce Clause does not forbid

"rules restricting to state residents the enjoyment of state educational institutions, energy generated by a state-run plant, police and fire protection, and agricultural improvement and business development programs. Such policies, while perhaps 'protectionist' in a loose sense, reflect the essential and patently unobjectionable purpose of state government—to serve the citizens of the State."

*Id.* at 442, 100 S.Ct. at 2280 (footnote omitted).[11] We are mindful that the purpose of the Commerce Clause is to promote the formation of a national "common market" by prohibiting trade barriers between the states.[12] *Hunt, su-*

---

**11.** State discrimination against nonresidents is limited by the Privileges and Immunities Clause, however. *See Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978); *Baldwin v. Montana Fish and Game Comm'n, supra;* and *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869).

**12.** In *Hood & Sons v. DuMond,* 336 U.S. 525, at 539, 69 S.Ct. 657, at 665, 93 L.Ed. 865 (1949), the Court said:

"Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the

*pra,* 432 U.S. at 350, 97 S.Ct. at 2445; *Alexandria Scrap, supra,* 426 U.S. at 807, 96 S.Ct. at 2496. Nevertheless, we are also a federal union of sovereign states in which local governments are given primary responsibility for providing many of the services that the public relies upon, such as education, police and fire protection. Inevitably, tension may develop between the local control envisioned by federalism and the establishment of a national economy.[13] But, as the Supreme Court has made clear, the power of local governments to serve their citizens need not yield in every instance to the desire for national uniformity. It was in this context that the Supreme Court said in *Reeves:*

> "Restraint in this area is also counseled by considerations of state sovereignty . . . ."

447 U.S. at 438, 100 S.Ct. at 2278 (footnote omitted). This is an appropriate case for the exercise of such restraint. Accordingly, we hold that Regulation 4(d) does not violate the Commerce Clause.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR CHARLES COUNTY WITH DIRECTIONS TO ENTER A PARTIAL DECLARATORY

---

certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality."

**13.** As one commentator has said:

"When the Framers provided for concurrent federal and state taxing, spending, and regulatory powers, they sanctioned a diversity of policies among the states. That diversity inevitably distorts business location and resource allocation decisions from what they would be in a true free-trade area. The Framers thus compromised to some degree the national free-trade objectives of the commerce clause in the interest of state power. If sufficiently important to the fulfillment of core state functions, certain distinctions based on residence might also be justified despite their incompatibility with strict adherence to the unification objective of the commerce and privileges and immunities clauses."

Varat, *supra,* note 17 at 522.

JUDGMENT ON THE COMMERCE CLAUSE ISSUE CONSISTENT WITH THIS OPINION, AND FOR FURTHER PROCEEDINGS ON THE REMAINING CONSTITUTIONAL ISSUES RAISED, BUT NOT DECIDED, BY THE CIRCUIT COURT; COSTS TO BE PAID BY APPELLEE, ALBERT W. STEVENS.