BARKER BROTHERS WASTE, INC.;
Northwest Tennessee Disposal Corpora-
tion; Donna Parish; Regina Marshall;
Lloyd Smith; and Linda Smith, Plain-
tiffs,

v.

DYER COUNTY LEGISLATIVE BODY;
and the following individual Commis-
sioners, in their capacity as Elected Of-
ficials: William Cloar; Ralph Henson;
Richard Hill; John Holden; Johnny
Jenkins; Barry Ladd; Milton Magee;
Roland Morris; Terry McCreight; Wil-
lie Reasons and Joe Swafford; and
Browning–Ferris Industries of Tennes-
see, Inc., Defendants.

No. 95–2942–GA.

United States District Court,
W.D. Tennessee,
Western Division.

Jan. 16, 1996.

Michael G. McLaren and Buckner Wellford, Thomas Hendrix Harvey Johnson & Mitchell, Memphis, TN, for Plaintiff.

Thomas L. McAllister, Harris Shelton Dunlap & Cobb, Memphis, TN, for Defendant Browning–Ferris Industries.

Russell E. Reviere, Rainey Kizer Butler Reviere & Bell, Jackson, TN, for Defendant Dyer County Legislative Body.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GIBBONS, District Judge.

This case arises out of the award of a contract for residential non-hazardous waste service in Dyer County, Tennessee. Plaintiffs, who include an unsuccessful bidder for the contract, seek a declaratory judgment and sue pursuant to 42 U.S.C. § 1983, alleging two claims under the United States Constitution—that defendant Dyer County Legislative Body (Dyer County) violated the Commerce Clause and the Due Process Clause of the Fourteenth Amendment. Plaintiffs also allege that Dyer County violated various Tennessee statutes regulating competitive bidding processes and exclusive franchises, specifically T.C.A. §§ 5–14–101 et seq., 6–2–201(12), and 5–1–118. The relief sought includes a declaratory judgment, a preliminary injunction and money damages.

Pursuant to Federal Rule of Civil Procedure 65(a)(2), and upon agreement of the parties, the court consolidated the disposition of plaintiffs' motion for preliminary injunction with the disposition on the merits. A hearing on the motion was held December 14, 1995. Subsequent to the hearing, the parties submitted additional briefs. For the following reasons, the court denies plaintiffs' motion for a preliminary injunction. The court also finds that plaintiffs' constitutional claims are without merit and that plaintiffs' state law claims should be dismissed for lack of jurisdiction.

## I. FINDINGS OF FACT

The primary plaintiff in this action is Barker Brothers Waste, Inc., a Tennessee corporation whose parent corporation is Continental Waste Industries, a Delaware corporation. Barker Brothers, for the last four years, has collected residential and commercial non-haz-

ardous solid waste in Dyer County, Tennessee. During this time, Barker Brothers has disposed of the solid waste collected in Dyer County in a landfill owned by the Northwest Tennessee Disposal Corporation and located outside of Troy, Tennessee in Obion County. Northwest Tennessee Disposal Corporation is also a plaintiff in this action.[1]

Defendant Dyer County Legislative Body (Dyer County) is the governing legislative entity for Dyer County, Tennessee. Defendant Browning–Ferris Industries of Tennessee, Inc. (BFI) is a Tennessee corporation engaged in the waste hauling and disposal industries.

In August of 1995, Dyer County solicited bids for the provision of residential non-hazardous solid waste service (including hauling and disposal) for all county residents not located within the City of Dyersburg.[2] The solicitation offered to the successful bidder an exclusive contract to service solid waste within the county. The county's purpose in contracting out solid waste service was to ensure compliance with a state mandate requiring counties to have collection available to ninety percent of their residents by January 1, 1996.[3]

Prospective contractors submitting bids were required to specify one of two waste disposal options. Option One was that "[a]ll refuse collected for disposal by the Contractor shall be hauled to the City of Dyersburg's landfill at 2550 Sorrell's Chapel Road." It is undisputed that the City of Dyersburg's landfill is a government-owned landfill, owned and operated by the city. Option Two provided for disposal at any other site designated by the prospective contractor. A prospective contractor wishing to utilize a landfill under Option Two was required to provide detailed information regarding that landfill's permits, licenses, and environmental violations, if any. Under the explicit terms of the bid solicitation, a contractor was permitted to submit two bids, one under each disposal option.

In addition to designating a disposal site, prospective contractors were required to present to the county a wide variety of infor-

1. Certain customers of Barker Brothers are also named as individual plaintiffs, and the complaint asserts a due process claim on their behalf. That claim has been abandoned however and is not mentioned in any of plaintiffs' filings with the court.

2. The City of Dyersburg is an incorporated municipality within Dyer County.

3. The contract does not require mandatory collection of residential waste; each resident can choose whether to participate in the curb-side collection program.

mation, including insurance and performance bond verification, a certified financial statement, evidence of good standing under the laws of Tennessee, an inventory of relevant equipment, a list of past and pending civil and criminal liabilities, proposed fee schedules, and descriptions of additional services available (*i.e.*, recycling, public education, customer relations, and waste convenience centers). Dyer County's bid solicitation identified the criteria upon which it would award the contract:

> Selection of the Contractor will not be based solely on price. The bids will be evaluated according to the following criteria: (a) ... Competency of Bidder; (b) proposed Disposal Sites(s); (c) proposed fee schedule; (d) overall benefit to the county; and (e) any other factors deemed relevant by the County.

Plaintiff Barker Brothers submitted a bid under Option Two, designating Northwest Tennessee's landfill in Obion County. Barker Brothers' bid included a monthly fee proposal of $12.36. In addition, its proposal referred to current customer satisfaction and growth rates within Dyer County, as well as current and future recycling capabilities. Defendant BFI submitted a bid under Option One. BFI's bid proposal included a monthly fee of $12.57. In addition, BFI offered a comprehensive educational program and recycling capabilities. Defendant BFI also offered to open an office in the county and employ local residents.

Subsequent to the submission of bids, the Conservation and Environment Committee of the Dyer County Legislative Body recommended that the full Legislative Body accept the bid of BFI. Notes from one committee meeting, dated August 23, 1995, indicate concern with Barker Brothers' record of environmental violations. On that same occasion, the notes reflect some discussion that the county should award its contract to a trash hauler willing to use the Dyersburg landfill in order to "keep trash in county, reduce costs, [and] increase volume." In a committee meeting on August 30, Barker Brothers offered to amend its bid proposal to include the Dyersburg landfill option. The record, while vague, seems to indicate that the committee felt it improper to accept a bid amendment. The committee voted to recommend BFI.

On September 11, 1995, the Dyer County Legislative Body voted to award the waste contract to BFI. The minutes from that meeting indicate that some members of the Legislative Body were concerned with keeping "the Dyersburg landfill viable." There was also discussion of Barker Brothers' violations of environmental regulations. The final vote was 11 to 8.

Barker Brothers has over 21,000 customers (18,000 residential, 3000 commercial) throughout Tennessee. It will lose 1560 customers as a result of the contract award to BFI.

Although Barker Brothers argues that the Dyer County action will harm its good will, there is no evidence in the record to support this assertion. In fact, the proof suggests that Barker Brothers' relationship with other counties and cities is exemplary and unlikely to be affected by Dyer County's action.[4]

Barker Brothers and Northwest Tennessee Disposal Corporation now sue, alleging that the bidding process violated the Commerce Clause of the United States Constitution. As part of its complaint, plaintiffs allege that the bidding process was a front for "an undisclosed political agenda ... to award the bid only to a hauler which would take the waste to the City Landfill." As such, plaintiffs contend, the bidding process constitutes a discriminatory and unreasonable "flow control" measure, designed to prevent the export of a local commodity and in violation of the constitutional prohibition against local economic protectionism.

In support of its theory, plaintiffs point to the testimony of Molly Williams, a member of the Conservation and Environment Com-

---

**4.** Mike Pentecost, the mayor of Dresden, states that, "the City has been totally satisfied with the level of service provided. The firm has been honest and straight forward with it [sic] dealings with the city." Tommie Goodwin, the major of Trenton, states that "Barker Brothers relationship with City of Trenton is surperb [sic] and I can highly recommend them for your consideration." Fran Hearn, the treasurer of Tiptonville states that for over ten years, "the City has always been very satisfied with the courteous and efficient manner in which Barker Brothers does business."

mittee at the time the service contract was awarded to BFI and a member of the Legislative Body during the time that the bid specifications were drafted. Williams conceded in her deposition that members of the Legislative Body were concerned with maintaining volume at the city landfill. Furthermore, plaintiffs point out, the minutes from the Legislative Body's September 11, 1995 meeting explicitly indicate that the county was concerned with the economic viability of the city landfill and was aware that the volume of waste generated by the county would help ensure the landfill's viability by providing a reliable source of income through "tipping" fees imposed upon that waste.[5]

Plaintiffs also rely heavily on a Solid Waste Management Plan for Crockett, Dyer and Gibson Counties.[6] The management plan articulates, as one of many future alternatives, the possibility that the Dyersburg City Landfill could opt to become a regional landfill, in which case the counties, in order to finance a regional landfill, would attempt to control the flow of their wastes to that site.[7] Finally, plaintiffs point out that Barker Brothers' bid was lower than BFI's, indicating, according to plaintiffs, that the county intended only to award a contract to a contractor willing to use the city landfill.

Defendants question all of plaintiffs' inferences. First, defendants note that Williams specifically testified that the county did not consider the waste management plan in its bid solicitation or contract award deliberations. Second, Williams testified that numerous factors caused the county to choose BFI, including its educational program and environmental compliance record, as well as BFI's proposal to use the local landfill.

As an initial matter, the court finds that the county considered, *inter alia*, the local economic benefit implicit in a contractor's willingness to use the publicly-owned Dyersburg landfill. The county's consideration of this factor is obvious from the minutes of the September 11, 1995 meeting. Yet, the local economic benefit was simply one of many factors influencing the county's decision; no question is raised by plaintiffs as to the propriety of consideration of these other factors. Contrary to plaintiffs' characterizations, there is simply no evidence suggesting that the county embarked upon an effort to circumvent United States Supreme Court precedent with respect to the Commerce Clause. First, the record contains competent evidence supporting a decision by the county that BFI's bid proposal was superior to that of Barker Brothers.[8] Second, even if the court were to consider the discussion of

---

5. A tipping fee is the charge, usually calculated per ton of waste, for disposing waste in a landfill.

6. Plaintiffs fail to adequately establish the legal consequence of this management plan. Defendants argue the plan has no legal effect until it is adopted by the state pursuant to T.C.A. § 68–211–814. Plaintiffs do not contest this assertion. The state rejected the plan on November 7, 1994 on the grounds that its discussion of various matters was deficient. The record is void of any proof as to whether the plan was ever corrected and whether it was subsequently approved or disapproved by the state.

Furthermore, plaintiffs submit proof that the plan was adopted by the County on April 11, 1994, but submit for the court's review a plan dated July 1, 1994. Plaintiffs have failed to explain the differences between the plan submitted to the court and the plan approved by Dyer County on April 11, 1994. For example, the July 1, 1994 plan, which was presumably submitted to the state on July 1, 1994 in accord with T.C.A. § 68–211–814, acknowledged the need to comply with the Supreme Court ruling in *C & A Carbone, Inc. v. Town of Clarkstown,* — U.S. —, 114

S.Ct. 1677, 128 L.Ed.2d 399 (1994). Obviously, such considerations would have been impossible on April 11, 1994, as *Carbone* was not decided until May 16, 1994.

7. An additional problem with plaintiffs' reliance on the plan is that the City of Dyersburg has never formally adopted the suggestion that its landfill become a regional landfill.

8. A number of considerations favored the BFI proposal. BFI promised jobs for the county and promised to open an office in the County; Barker Brothers apparently intended to operate out of its Union City headquarters. BFI offered a sophisticated educational curriculum including teaching materials, a neighborhood watch program to accompany its hauling service, and an impressive recycling package. Finally, and perhaps most importantly, BFI offered a clean environmental record. While the nature and number of any violations by Barker Brothers and the Northwest Tennessee landfill are not before the court, it is clear that those violations were of concern to the Legislative Body on September 11.

"flow control" measures in the July 1, 1994 waste management plan, there is simply no evidence linking that discussion with the 1995 contract decision. Finally, there is no evidence suggesting that the purpose of the bid solicitation format (i.e., asking prospective contractors to designate either the Dyersburg Landfill or any other landfill) was anything other than an effort to encourage awareness of the availability of the Dyersburg Landfill. Indeed, Ms. Williams, one of the authors of the solicitation documents, specifically testified that the format was solely intended to advertise the variety of disposal options in an effort to increase the number of bids submitted.

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

■ The court first considers plaintiffs' request for a preliminary injunction. In order to grant a preliminary injunction, a district court must consider four elements:

(1) the likelihood of the plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served.

*Performance Unlimited v. Questar Publishers, Inc.,* 52 F.3d 1373, 1381 (6th Cir.1995) (citations omitted). It is well-established that, "[a]s a general rule, a movant has not established irreparable harm where damages would adequately compensate the movant for the asserted harm." *Id.* at 1382 (citations omitted). The court finds that plaintiffs have failed to show irreparable harm and, accordingly, denies plaintiffs motion for a preliminary injunction.

As noted previously, Barker Brothers will lose 1560 customers as a result of the contract award to BFI. This loss, amounting to a mere 7.4% of Barker Brother's business (calculated by number of customers), is not sufficient to constitute an "impending loss or financial ruin" of its business. *Id.*[9] Nor has Barker Brothers established any harm to good will as a result of the award to BFI.

Finally, plaintiffs rely on an alleged loss of fair competition but cite only to cases involving a breach of a non-competition clause. *See, e.g., Basicomputer Corp. v. Scott,* 973 F.2d 507 (6th Cir.1992). This record reveals nothing about the award of a contract to BFI that would affect plaintiff Barker Brothers' ability to compete for other customers outside of Dyer County.

For these reasons, the court finds that any injury to Barker Brothers is calculable and compensable, and therefore not irreparable. The court accordingly denies plaintiffs' motion for a preliminary injunction on that basis.[10]

■ Turning to the merits of this dispute, the principal legal issue for resolution by the court is whether the county's consideration of local landfill use as a single bid evaluation criterion constitutes a protectionist restriction in violation of the Commerce Clause.[11]

---

9. Plaintiffs' reliance on *Performance Unlimited* is unpersuasive. In *Performance Unlimited* the record clearly established that the threatened "license agreement between [the parties] is by far the single most significant royalty-producing license agreement that Performance Unlimited has, and royalties received from the license constitute the single largest amount of royalty income received [by plaintiff]." *Id.* at 1381. Given the small percentage of its customers within Dyer County, Barker Brothers cannot credibly argue that the loss of this particular contract will result in "economic collapse or insolvency." *Id.* at 1382.

10. Because the court also finds plaintiffs' constitutional claims to be without merit, denial of the motion based on a failure to show sufficient likelihood of success on the merits is also appropriate.

11. Although the issue is not raised by the defendants, the court has reservations regarding plaintiffs' standing. Plaintiffs have clearly satisfied the constitutional requirements of standing; namely injury-in-fact, causation, and redressibility. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). It is not clear however that plaintiffs have satisfied the prudential principles governing standing; that is, it is not self-evident to the court that plaintiffs' interests are within the zone of interests sought to be protected by the dormant Commerce Clause. *See Boston Stock Exchange v. State Tax Commission,* 429 U.S. 318, 320–321 n. 3, 97 S.Ct. 599, 602–603 n. 3, 50 L:Ed.2d 514 (1977) (applying the "zone of interests" test of standing to the dormant Commerce Clause). Plaintiff Barker Brothers (the trash collector) and plaintiff Northwest Tennessee Disposal Corporation (the disposal site) are both Ten-

Article I, Section 8 of the Constitution provides that "The Congress shall have Power ... to regulate Commerce with foreign Nations, and among the several States and with the Indian Tribes." U.S. CONST. Art I, § 8. While a literal reading of the Commerce Clause evinces a grant of power to Congress, it has long been recognized that the clause also directly limits the power of States to discriminate against interstate commerce. *Wyoming v. Oklahoma*, 502 U.S. 437, 451–457, 112 S.Ct. 789, 799–801, 117 L.Ed.2d 1 (1992); *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 534–535, 69 S.Ct. 657, 663–664, 93 L.Ed. 865 (1949). "This 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit instate economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). "'Discrimination' simply means different treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Dept. of Environmental Quality*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). The judicially-created application of the Commerce Clause to impose limitations on states in the absence of Congressional action is referred to as the dormant Commerce Clause. *C & A Carbone, Inc. v. Town of Clarkstown*, —— U.S. ——, ——, 114 S.Ct. 1677, 1687, 128 L.Ed.2d 399 (1994) (O'Connor, J., concurring).

The United States Supreme Court has distinguished between state statutes that burden interstate transactions only incidentally and those that affirmatively discriminate against such transactions. Statutes in the first group violate the Commerce Clause only if the burdens they impose on local commerce are "clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). *Accord Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). Under the balancing test set forth in *Pike v. Bruce Church, Inc.*, the burden of demonstrating unconstitutional discrimination shifts to the challenger where the discrimination is not apparent on the face of the statute:

> [w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron [Portland] Cement Co. v. Detroit*, 362 U.S. 440, 443 [80 S.Ct. 813, 815–816, 4 L.Ed.2d 852] [ (1960) ]. If a legitimate local purpose is found then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the

---

nessee corporations operating in Tennessee. Therefore, no out-of-state interests have been affected. While Dyer County's action *could* have affected interstate commerce had it discriminated against an out-of-state garbage collector or an out-of-state disposal site, it did not do so in this case. In other words, the court is not convinced that the plaintiffs are even "engaged in interstate commerce." *Dennis v. Higgins*, 498 U.S. 439, 448, 111 S.Ct. 865, 871, 112 L.Ed.2d 969 (1991).

Despite these reservations, the court concludes that it is not free to dismiss this case for lack of standing. In *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Department of Natural Resources*, 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992), the Supreme Court found that "a State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself." *Id.* at 361, 112 S.Ct. at 2024. This language appears to broaden the zone of interests intended to be protected by the dormant commerce clause to include out-of-county, but in-state, plaintiffs. As one district court has concluded, "[i]t appears that this right [to engage in interstate commerce free of discrimination] confers upon any potential litigant who has suffered an injury in fact as the result of a dormant commerce clause violation the right to sue in federal court to enjoin continued violations." *Government Suppliers Consolidating Services, Inc. v. Bayh*, 753 F.Supp. 739, 761 (S.D.Ind.1990) (internal quotations omitted). Moreover, the court is reluctant to dismiss on prudential standing grounds where defendant has identified no case, nor has the court found a single case, dismissing a plaintiff's dormant Commerce Clause claim on such a basis. The court therefore considers the merits of plaintiffs' claim.

local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

397 U.S. at 142, 90 S.Ct. at 847.

■ Statutes in the second group are subject to more demanding scrutiny. *See generally Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). When a state statute clearly discriminates against interstate commerce, either on its face or in practical effect, it will be struck down, unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. *Wyoming v. Oklahoma*, 502 U.S. at 454, 112 S.Ct. at 800; *Maine v. Taylor*, 477 U.S. at 138, 106 S.Ct. at 2447; *Nat'l Solid Wastes Management Assoc. v. Voinovich*, 959 F.2d 590, 593 (6th Cir.1992). In such cases, the burden falls on the State to demonstrate both that the statute serves a "legitimate local purpose," and that this purpose could not be served as well by available nondiscriminatory means. *Maine v. Taylor*, 477 U.S. at 138, 106 S.Ct. at 2447; *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 957, 102 S.Ct. 3456, 3464–3465, 73 L.Ed.2d 1254 (1982); *Hughes v. Oklahoma*, 441 U.S. at 336, 99 S.Ct. at 1736; *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446–2447, 53 L.Ed.2d 383 (1977); *Dean Milk Co. v. Madison*, 340 U.S. 349, 354, 71 S.Ct. 295, 297–298, 95 L.Ed. 329 (1951). Justifications for discriminatory restrictions must pass the " 'strictest scrutiny.' The State's burden of justification is so heavy that 'facial discrimination by itself may be a fatal defect'." *Oregon Waste Systems, Inc.*, 511 U.S. at ——, 114 S.Ct. at 1351. *See also Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535–2536, 57 L.Ed.2d 475 (1978) (when the state statute amounts to simple economic protectionism, a "virtually *per se* rule of invalidity" applies).

Analysis of a regulatory scheme under the Commerce Clause thus initially requires a determination of whether the scheme in question regulates evenhandedly or whether it is discriminatory either on its face or in practical effect. If the scheme is found to be the former, it must survive the *Pike* balancing test. If the scheme is found to be the latter, the State's proffered justifications must withstand the "strictest scrutiny."

■ Courts have invalidated a wide variety of discriminatory state laws and local ordinances relating to the disposal of waste based on the dormant Commerce Clause. *See, e.g., Philadelphia v. New Jersey*, 437 U.S. at 622–623, 98 S.Ct. at 2534–2535 (1978) (foreclosing any argument that waste is exempt from the Commerce Clause and reasoning that "[j]ust as Congress has the power to regulate the interstate movement of these wastes, States are not free from constitutional scrutiny when they restrict that movement."). States, for example, may not prohibit the importation of waste from out-of-state, *id.* at 626–27, 98 S.Ct. at 2536–2537, nor may counties prohibit the importation of waste from outside their borders. *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dept. of Natural Resources*, 504 U.S. 353, 361, 112 S.Ct. 2019, 2024–2025, 119 L.Ed.2d 139 (1992). Conversely, states may not ban the export of waste, as to do so would deprive sister states of the valuable commerce of waste disposal. *Waste Systems Corp. v. County of Martin, Minnesota*, 985 F.2d 1381, 1386 (8th Cir.1993). *See also New England Power Co. v. New Hampshire*, 455 U.S. 331, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982) (voiding a state agency order requiring reservation of in-state produced hydroelectric power for in-state customers). States may not impose a different fee for disposal of out-of-state waste than that imposed upon in-state waste. *See Oregon Waste Systems*, 511 U.S. ——, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) (voiding fee differential based upon out-of-state origin despite proffered justification based upon differential costs); *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992) (voiding disposal fee on out-of-state hazardous wastes).

In its most recent pronouncement on the application of the dormant Commerce Clause to the waste industry, the United States Supreme Court invalidated a town's flow control ordinance that required all solid waste to be processed at a local solid waste transfer station. *C & A Carbone*, —— U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). The

town's flow control efforts applied both to locally-produced waste as well as to out-of-state waste handled locally. *Id.* at ——, 114 S.Ct. at 1681. The Court found that the ordinance was a discriminatory processing requirement that "hoards solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Id.* at —— ————, 114 S.Ct. at 1682–83 (comparing the flow control measure to a long line of local processing requirements held by the Court to be invalid). The Court was not concerned by the fact that both in-state and out-of-state transfer stations were discriminated against in favor of a particular local facility, finding that "this difference just makes the protectionist effect of the ordinance more acute." *Id.* at ——, 114 S.Ct. at 1683. Since the Court found that the "practical effect and design" of the ordinance was discriminatory, the Court employed a heightened scrutiny analysis instead of the *Pike* balancing formula, and consequently ruled that the ordinance was unconstitutional. *Id.* at ——, 114 S.Ct. at 1684.

 As the court found above, Dyer County considered the local economic benefit to be gained by the bidder's proposed use of the publicly-owned Dyersburg landfill. Other legitimate, non-discriminatory factors were also considered.[12] The question before the court, therefore, is whether this consideration is sufficient to deem the bid selection scheme protectionist, therefore triggering heightened scrutiny; or whether the scheme is not protectionist, therefore triggering a *Pike* analysis of benefits and burdens. Considering the facts of this case and the relevant authorities, the court finds that the scheme is not protectionist.

The United States Court of Appeals for the Third Circuit considered a similar question in *Atlantic Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atlantic County,* 48 F.3d 701, 713 (3rd Cir. 1995). In *Atlantic Coast,* New Jersey state law permitted the relevant state agency to establish solid waste districts. *Id.* at 706. These districts were in turn permitted to control the flow of waste within the district to a designated disposal site. *Id.* The designation process allowed districts to choose a disposal facility within the district, outside the district but within the state, or out-of-state. *Id.* at 707. The court found that the disposal site designation criteria discriminated against interstate commerce because, "the designation process is intended to favor operators that have facilities already located within, or those that are willing to construct a facility, within the state." *Id.* at 708. The court found that the mere act of favoring a local provider through a designation process violated the Commerce Clause:

> It is true ... that New Jersey has not placed an absolute bar on the utilization of out-of-state facilities as designated facilities. This, however, does not transform a fundamentally discriminatory scheme into a non-discriminatory one. While out-of-state facilities can compete to become designated facilities, the [state] acknowledges that it approves district plans only if they are consistent with the "core" goal of having all of New Jersey's solid waste processed and disposed of in New Jersey ... In short, out-of-state facilities do not compete on anything approaching a level playing field.

*Id.* at 713.[13]

In October of 1995, the Third Circuit once again examined the application of the dormant Commerce Clause to flow control ordinances, stating that "[*Carbone* ] did not establish a per se rule subjecting all flow

---

12. *See supra* note 8. For example, the concern regarding Barker Brothers' record of environmental violations, given the uncertain and perhaps unlimited solid waste liability faced by municipalities, is certainly a legitimate local interest. *See e.g., B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1199 (2nd Cir.1992) (finding municipalities subject to liability under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607(a) (1988) if they "arrange" for the disposal of municipal solid waste containing hazardous substances).

13. Despite its finding that the New Jersey law impermissibly favored in-state providers, the Third Circuit, analogizing to the public utility context, was careful to note that the mere award of an exclusive contract to a captive consumer base does not violate the Commerce Clause. *Atlantic Coast,* 48 F.3d at 715.

control ordinances to strict scrutiny." *Harvey & Harvey, Inc. v. County of Chester,* 68 F.3d 788, 801 (3rd Cir.1995). The court in *Harvey* noted that despite its decision in *Atlantic Coast,* "not every process used to select a single provider is necessarily infected with this same parochialism." *Id.* at 802. In order to assist a district court in determining whether a designation process was "open and competitive and offered truly equal opportunities to in- and out-of-state businesses," the Third Circuit articulated a reasonableness inquiry. *Id.*

A plaintiff wishing to show discrimination, the court observed, could do so by pointing to explicit evidence of favoritism, parochial incentives such as a municipal investment, or restrictive terms such as excessively long contract periods. *Id.* Conversely, a defendant wishing to rebut a discrimination charge could point to the bid solicitation process, objective selection criteria, statistical evidence, or expert testimony tending to show that out-of-state interests were not disfavored. *Id.* at 803. Importing the usual Commerce Clause burdens of proof, the court found that, "the burden of showing that the statute discriminates rests on the party challenging the statute." *Id.* at 802 (*citing Hughes v. Oklahoma,* 441 U.S. at 336, 99 S.Ct. at 1736).

This court finds additional guidance in other Commerce Clause cases not within the waste context. The United States Supreme Court has consistently avoided application of strict scrutiny (either as a consequence of discriminatory purpose or as a consequence of discriminatory effect) simply on the basis of stray comments by legislators or on the basis of incidental side effects. In *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), for example, the Court refused to find protectionism on the basis of incidental benefits to the local economy. *Id.* at 471 n. 15, 101 S.Ct. at 727–728 n. 15 (*citing Id.* at 463 n. 7, 101 S.Ct. at 723 n. 7) ("We will not invalidate a state statute under the [Commerce Clause]

merely because some legislators sought to obtain votes for the measure on the basis of its beneficial side effects on state industry."). *See also Maine v. Taylor,* 477 U.S. 131, 149, 106 S.Ct. 2440, 2453, 91 L.Ed.2d 110 (1986) (rejecting the challengers' contention that a few sentences of overt protectionist motive in a 2,000 word statement submitted by the State advancing the justifications for the regulation "convert[ed] the Maine statute into an economic protectionism measure.").

A fair reading of *Harvey,* in combination with the Supreme Court's expressed reluctance to require strict scrutiny on the basis of marginal evidence of discrimination, leads the court to conclude that a bidding process may constitute a regulation for the purposes of the Commerce Clause only if the discriminatory evaluation criteria can reasonably be said to infect the contract selection process so as to have the effect or purpose of discriminating against interstate commerce. *See Harvey,* 68 F.3d at 802–03. Furthermore, a reasonableness inquiry into the purpose or effect of evaluation criteria must not allow an otherwise legitimate bidding process to be tainted by an inconsequential protectionist statement or side effect, or an isolated discriminatory evaluation criterion. *See Maine v. Taylor,* 477 U.S. at 149, 106 S.Ct. at 2453.

Using these principles as a guide, and recalling that plaintiffs have the burden of showing discrimination, the court finds that the Dyer County bidding process, as a whole, was not discriminatory. Dyer County has articulated no mandated preference toward local providers similar to the preferences mandated by state regulations in *Atlantic Coast. Atlantic Coast,* 48 F.3d at 713. Furthermore, the court, in its findings of facts above, identified numerous other legitimate criteria that influenced the county's decision. While it is true that the county may have had an economic incentive to direct waste to the Dyersburg Landfill, it is also true that the county has an economic incentive to choose the lowest bidder.[14] Moreover, the county

---

14. The court notes that the economic pressure in this case is somewhat speculative in that it is dependent upon a future hypothetical decision by Dyersburg to upgrade its landfill. Furthermore, the economic pressure is indirect in that the cost of upgrading would fall on the city, not the county, whereas it is the county in this case that is charged with discrimination. *Compare Har-*

has equally strong interests in protecting itself against environmental liability, complying with state recycling mandates, complying with state educational requirements, attracting national corporate activity within the county, and providing comprehensive solid waste service. Finally, the five-year term of the service contract is not excessive and therefore not suggestive of discrimination. *Harvey,* 68 F.3d at 798, 809 n. 19 (noting that "the one-time selection of an in-state interest does not by itself establish a discriminatory effect unless the selection confers an unreasonably long-term benefit" and finding a ten-year contract period to be reasonable).[15] The court finds that the September 11, 1995 minutes revealing a discussion of landfill "viability" do not taint an otherwise fair and competitive bidding process.

Accordingly, the court holds that the bidding process was evenhanded and does not have the purpose or effect of discriminating against interstate commerce. Furthermore, there have been no allegations that, under a *Pike* analysis, the discriminatory effects outweigh the local benefits. The court, therefore, finds that Dyer County did not violate the Commerce Clause.

 The parties have argued at length the application of the market participant doctrine. Although the court's prior ruling renders consideration of the doctrine unnecessary, the court will nevertheless discuss it, assuming, *arguendo,* that the bidding process was in fact deemed discriminatory. The court concludes that, even if the county discriminated against interstate commerce, it did so solely as a market participant and is therefore immunized from claims brought under the dormant Commerce Clause.

 A discriminatory state or local law or ordinance does not violate the Constitution if the state or subdivision is acting as a market participant. The reason for the market participation exception is clear: the Commerce Clause only withholds from the states the power to "regulate" interstate commerce and therefore does not affect other state actions that may impact interstate commerce. *See SSC Corp. v. Town of Smithtown,* 66 F.3d 502, 510 (2nd Cir.1995), *petition for cert. filed,* 64 U.S.L.W. 3380 (U.S. Nov. 20, 1995) (No. 95–782) and 64 U.S.L.W. 3440 (U.S. Dec. 19, 1995) (No. 95–1015). The United States Supreme Court first articulated the market participant exception to the dormant Commerce Clause in 1976, stating that "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 810, 96 S.Ct. 2488, 2498, 49 L.Ed.2d 220 (1976). In *Alexandria Scrap,* the Court upheld Maryland's effort to rid itself of junk automobiles by paying bounties to in-state scrap auto processors even though Maryland refused to pay bounties to out-of-state scrap auto processors. *Id.* at 797, 96 S.Ct. at 2491–2492.[16]

---

*vey,* 68 F.3d at 806–807 (finding discrimination where the county had a huge economic interest at stake including a $41.5 million guarantee agreement).

**15.** As an additional matter, the court notes that plaintiff Barker Brothers offered to amend its bid to include disposal at the Dyersburg landfill. While the record suggests that the committee's refusal to permit this was due to concerns about the propriety of such an amendment, the refusal to allow an amendment also indicates that the committee was truly concerned with issues other than local protectionism.

**16.** While *Alexandria Scrap* is often regarded as the Supreme Court's first acceptance of the market participant doctrine, four years earlier, the Court had affirmed a lower court's ruling sustaining a Florida statute requiring all public

printing for the state to be done within the state. *American Yearbook Co. v. Askew,* 409 U.S. 904, 93 S.Ct. 230, 34 L.Ed.2d 168 (1972), *aff'g* 339 F.Supp. 719 (M.D.Fla.1972). The district court in this case reasoned that, "[t]rade regulations are clearly subject to Commerce Clause restrictions, but statutes that merely specify the conditions of state purchases are not." *Id.* at 725. Indeed, the roots of the market participant doctrine are even deeper. In reaching its result, the district court in *American Yearbook* relied on the Supreme Court case *Atkin v. Kansas,* 191 U.S. 207, 222, 24 S.Ct. 124, 127, 48 L.Ed. 148 (1903) ("[I]t belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities."). *See also Field v. Barber Asphalt Paving Co.,* 194 U.S. 618, 24 S.Ct. 784, 48 L.Ed. 1142 (1904) (rejecting a

In order for a state (or subdivision of the state) to leverage its investment as a market participant in favor of local interests and to the detriment of out-of-state interests, two findings are required. First, the challenged state action must relate primarily to the state's participation in the marketplace rather than to "state taxes and regulatory measures." *Reeves, Inc. v. Stake,* 447 U.S. 429, 437, 100 S.Ct. 2271, 2277, 65 L.Ed.2d 244 (1980) (upholding a South Dakota policy restricting the sale of cement from a state-owned facility to state residents). Second, the state control or discrimination must occur in the narrow market within which the state is participating. *South–Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 97–98, 104 S.Ct. 2237, 2245–2246, 81 L.Ed.2d 71 (1984) (invalidating as a downstream restriction an Alaskan requirement that timber taken from state lands be processed within the state prior to export). That is, as in *South–Central Timber,* the state may sell its timber to whomever it likes, but it may not control the market subsequent to its sale. *See also White v. Mass. Council of Construction Employers, Inc.,* 460 U.S. 204, 211 n. 7, 103 S.Ct. 1042, 1046 n. 7, 75 L.Ed.2d 1 (1983) (sustaining a City of Boston requirement that contractors for publicly funded construction projects hire city residents and reasoning that "[e]veryone affected by the order [was], in a substantial if informal sense, working for the city.")

The United States Supreme Court has not yet applied the market participant doctrine to flow control ordinances, but the principles it has articulated apply to such ordinances easily. In order for the market participant exception to the Commerce Clause to apply to "flow control ordinances," the governmental entity must participate in both the trash hauling business and the trash disposal business.[17] If the governmental entity participates in one market but not the other, the flow control regulation would be unconstitutional.

For example, if a city owned a landfill (and therefore participated in the trash disposal business) it could not therefore direct all citizens within its jurisdiction to dispose of their garbage in its landfill. Such an action would be primarily regulatory, and would constitute an impermissible export ban. *Atlantic Coast,* 48 F.3d at 717 ("[These flow control] regulations do not concern only the manner of operation of the government-owned or government-managed designated disposal facilities; they require everyone involved in waste collection and transportation to bring all waste collected in the district to the designated facilities for processing and disposal ... [therefore they involve the state] as a market regulator, not in its capacity as a market participant."). Similarly, a city could not require all waste produced within its jurisdiction to be processed at its processing facility. *Carbone,* —— U.S. at ——––——, 114 S.Ct at 1682–83. However,

commerce clause challenge to a local requirement that all public paving project utilize a particular, foreign-produced, asphalt); *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940) ("Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases.").

17. Arguably, the fact that the designated facility in this case, the Dyersburg City Landfill, is publicly-owned constitutes government participation in the disposal market. Indeed, the Supreme Court, on numerous occasions, has expressly reserved the question of the effect on the dormant Commerce Clause of public ownership of a landfill. *Philadelphia v. New Jersey,* 437 U.S. at 627 n. 6, 98 S.Ct. at 2537 n. 6 (declining to address whether a governmental entity that operates a landfill is a market participant); *see also Oregon*

*Waste Systems,* 511 U.S. at —— n. 9, 114 S.Ct. at 1354 n. 9 (declining to address whether differential fees by a state-owned facility would be constitutional); *Fort Gratiot,* 504 U.S. at 358–359, 112 S.Ct. at 2023 ("Nor does this case raise any question concerning policies that municipalities or other governmental agencies may pursue in the management of publicly owned facilities."); *Id.* at 366–367 n. 7, 112 S.Ct. at 2027 n. 7 (distinguishing the case before it from a hypothetical case involving "publicly produced [] or publicly owned" landfills). The court, however, declines to pursue this path because these Supreme Court cases involve the *selling* of landfill space, whereas this case involves the *purchasing* of landfill space. The ability of an owner to choose to sell or not to sell to a customer is obviously greater than the ability of an owner, absent regulatory authority, to require others to purchaser a product or service. *South–Central Timber,* 467 U.S. at 97–98, 104 S.Ct. at 2245–2246.

the governmental entity *could* exclude waste disposed in its landfill based upon geographic origin of the waste on the theory that it may sell landfill space to whomever it wishes. *Swin Resource Systems, Inc. v. Lycoming County*, 883 F.2d 245, 251 (3rd Cir.1989) ("If a city may constitutionally limit its truck to collecting garbage generated by city residents, we see no constitutional reason why a city cannot also limit a city-operated dump to garbage generated by city residents."), *cert. denied*, 493 U.S. 1077, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990). *Accord Shayne Brothers, Inc. v. District of Columbia*, 592 F.Supp. 1128, 1134 (D.D.C.1984); *County Commissioners of Charles County v. Stevens*, 299 Md. 203, 473 A.2d 12, 21 (1984).

■ With respect to the trash hauling business, if the governmental entity were to participate in this market, either through direct collection or through hiring private parties to collect garbage, then that entity, as a seller in the trash hauling market, could control decisions as to that market. *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1289 (2nd Cir.1995) ("[T]he market participation doctrine permits the Town to hire whatever company it chooses, on whatever terms it chooses, to provide municipal services."). For example, it could hire only local trash haulers, if it wanted. *White v. Massachusetts*, 460 U.S. at 214–215, 103 S.Ct. at 1048. Or it could purchase trash hauling trucks locally made, if it wanted. It could not, however, based upon its mere participation in the trash hauling market, require private landfills to exclude all waste other than its own. *See South–Central Timber*, 467 U.S. at 97–98, 104 S.Ct. at 2245–2246. Such a requirement would amount to "downstream regulation of the [disposal] market in which it is not a participant." *Id.* at 99, 104 S.Ct. at 2246.

If a governmental entity participates in both the hauling and disposing industries, however, then it may engage in a variety of flow control efforts, depending upon the nature of its participation. For example, a state that participated in both the hauling and disposal markets could require that the waste that it hires someone to pick up be disposed of in a local landfill. The question

before the court is whether a service contract constitutes participation in both the trash hauling and trash disposal markets.

The United States Court of Appeals for the Second Circuit has had occasion recently to consider this question. *SSC Corp. v. Town of Smithtown*, 66 F.3d 502 (2nd Cir. 1995). In this case, Smithtown contracted with SSC, a private hauler, to collect garbage, but conditioned its contract upon SSC's willingness to dispose of the waste at a privately-owned, though publicly-subsidized, incinerator. *Id.* at 507. The court avoided conflict with the prohibition against downstream regulation articulated in *South–Central Timber* by finding that the contract constituted participation in both the hauling and disposal industries since the town effectively purchased both the collection service and the landfill space. *Id.* at 517. The court reasoned that "because Smithtown is substantially the buyer (and consumer) of those [disposal] services, it can dictate by contract where SSC must purchase the waste disposal services provided to the town." *Id.* at 517.

This court agrees with the reasoning of the Second Circuit. In *South–Central Timber*, the State was precluded from imposing downstream restrictions because it sold its product to a private purchaser and, according to the Court, could not influence the flow of that product past the point of sale. *South–Central Timber*, 467 U.S. at 97–98, 104 S.Ct. at 2245–2246. A service contract, however, is not analogous to the sale of a product where the seller loses interest in the product after the point of sale. Indeed, a service contract is more similar to Boston's employment contract in *White* where the Supreme Court held that a state could condition an employment contract upon the contractor's willingness to hire local employees. 460 U.S. at 214–215, 103 S.Ct. at 1048. In a service contract, such as the contract between Dyer County and BFI, the contractor is acting much like an agent of the municipality. Through the actions of its contractor, then, the municipality is still participating in the marketplace. As the Second Circuit reasoned:

If Boston could require contractors for city-funded projects to hire a certain per-

centage of city residents, then Smithtown can require SSC to hire town residents to drive its garbage trucks—since those truck drivers would be "in a substantial if informal sense, 'working for the city.'" And if Smithtown can require SSC to hire local truck drivers, then it can require the hauler to use local incinerating services as well. *Smithtown,* 66 F.3d at 515 (internal citations omitted).

The court concludes that Dyer County is a participant in the trash hauling market through its decision to collect garbage and its subsequent decision to contract out that service. The fact that Dyer County decided to award an exclusive contract, a power that no private hauler would otherwise enjoy, does not alter the fact that it is a seller of collection services. Trash collection in Dyer County is entirely voluntary; each citizen is free to decline the service. Dyer County has imposed no ordinance upon anyone choosing not to purchase the service. Nor does Dyer County's involvement in the market include any of the usual indicia of regulation such as fines or penalties. *See Smithtown,* 66 F.3d at 512 (finding that Smithtown's flow control ordinance, as opposed to its service contract, did not involve market participation because it imposed criminal fines and jail sentences upon private garbage haulers who refused to utilize a particular local incinerator); *Atlantic Coast,* 48 F.3d at 717 (same).

Furthermore, the court concludes that Dyer County is "substantially the buyer" of landfill space and therefore is also a participant in the trash disposal market. As such, it may purchase landfill space from the Dyersburg Landfill and may discriminate against out-of-state sellers.

■ Plaintiffs argue that Dyer County is not a participant in the hauling and disposal markets because BFI, rather than the county, charges residents for the waste collection service. While Dyer County, as a governmental entity, does not directly spend money while purchasing landfill space or providing garbage collection, this fact does not dilute the county's participation in these markets. The constitutional analysis should not turn on the county's decision to allow the trash carrier to charge its residents directly rather than imposing a use-tax upon its residents and then reimbursing BFI for the cost of the landfill space. Nor is the analysis affected by the fact that only some residents participate in the program, while others dispose of their garbage themselves at convenience centers. This merely represents a political decision to allow program participants to shoulder the cost of solid waste disposal for the entire community.

Dyer County participates in both the hauling and disposal markets, as a seller in the former and as a purchaser in latter. The flow control effects of the contract, therefore, are not in violation of the Commerce Clause. It is not an export ban because the government has control of the article through its participation in the trash hauling business. Nor is the flow control restriction a downstream regulation because the government is the "substantial if informal" purchaser of landfill space.

Accordingly, while the court finds that the evaluation criteria discussed above are not discriminatory, the court also finds that even if they were discriminatory, the Commerce Clause would not apply to this case because Dyer County is acting solely as a market participant. Therefore, plaintiffs' Commerce Clause claim is without merit and is dismissed.

■ Plaintiffs also allege that the bid process violated their due process rights. The United States Supreme Court, however, has long-since foreclosed plaintiffs' arguments, finding no due process or takings violations by a municipality's decision to take over local garbage disposal and collection services. *California Reduction Co. v. Sanitary Reduction Works,* 199 U.S. 306, 26 S.Ct. 100, 50 L.Ed. 204 (1905); *Gardner v. Michigan,* 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212 (1905). Plaintiffs' due process claim is therefore without merit.

Plaintiffs also allege various state law violations. In view of the dismissal of the entirety of plaintiffs' federal question bases for subject matter jurisdiction, and in view of the early stage of this litigation, the court declines to exercise pendent jurisdiction over the remaining state claims. *See* 28 U.S.C.

§ 1367(c)(3); *Landefeld v. Marion Gen. Hosp., Inc.,* 994 F.2d 1178, 1182 (6th Cir. 1993) (*citing United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial ... the state claims should be dismissed as well.") ). Accordingly, plaintiffs' state law claims are dismissed without prejudice.

IT IS SO ORDERED.