**WASTE CONNECTIONS OF KANSAS, INC., et al., Plaintiffs,**

v.

**CITY OF BEL AIRE, KANSAS, Defendant.**

No. CIV.A. 02–1035–MLB.

United States District Court, D. Kansas.

March 1, 2002.

David M. Traster, William M. Anderson, Foulston & Siefkin L.L.P., Wichita, KS, April D. Cover, Lincoln, NE, for plaintiffs.

James S. Pigg, Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, Lee E. Parker, Office of the City Attorney, City of Bel Aire, Bel Aire, KS, for defendant.

## MEMORANDUM AND ORDER

BELOT, District Judge.

### I. INTRODUCTION

This matter is currently before the court upon plaintiffs' motion for a temporary and/or preliminary injunction. Doc. 4. Plaintiffs seek to enjoin defendant, the City of Bel Aire, Kansas ("City"), from entering into an exclusive contract for the curbside pickup of recyclable materials within the City. Doc. 5.[1] Finding jurisdic-

---

1. In considering plaintiffs' motion, the court has reviewed the following pleadings: (1) plaintiffs' complaint, (2) plaintiffs' motion for a temporary restraining order, (3) plaintiffs' memorandum in support of its motion, (4) the City's memorandum in opposition to plaintiffs' motion, (5) plaintiffs' motion to compel, and (6) plaintiffs' reply to the City's memorandum in opposition. Docs. 1, 4, 5, 10, 14, and 16. In addition, the court has considered the comments and arguments made during the two hearings held in this matter on February 5, 2002 and February 25, 2002. The court expresses its appreciation for the professional manner in which counsel have handled this matter.

tion proper with respect to the two federal constitutional issues raised in the motion, *see* 28 U.S.C. § 1331, the court DENIES plaintiffs' motion.

## A. Preliminary Injunction Standards

■ A preliminary injunction is an extraordinary remedy that is granted in only the most exceptional of circumstances. *See Buca, Inc. v. Gambucci's Inc.,* 18 F.Supp.2d 1193, 1200 (D.Kan. 1998). Its main purpose is to maintain the status quo so that the trial court can render a meaningful decision. *See id.* Only when this purpose can be accomplished should this court exercise its discretion and enter such a drastic order. *See id.* at 1201.

■ To obtain a preliminary injunction, the party seeking the injunction has the burden to demonstrate (1) it will suffer irreparable injury without the injunction, (2) its injury outweighs any injury the injunction will cause the opposing party, (3) the injunction furthers public interest, and (4) there is a substantial likelihood that the party seeking the injunction will ultimately prevail on the merits. *See Sizewise Rentals, Inc. v. Mediq/PRN Life Support Servs., Inc.,* 87 F.Supp.2d 1194, 1198 (D.Kan.2000). When the party seeking the injunction has met the first three elements, however, the Tenth Circuit applies "a modified interpretation" of the fourth element. *See id.* Specifically, the party seeking the injunction may satisfy the fourth element if it shows that there are "questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues fair ground for litigation and deserving of more deliberate investigation." *Buca, Inc. v. Gambucci's Inc.,* 18 F.Supp.2d 1193, 1201 (D.Kan.1998) (citing Tenth Circuit cases dating back to 1981).

The analysis below reviews plaintiffs' claims in light of this standard. To facilitate the expeditious ruling sought by the parties, the court will assume, without deciding, that plaintiffs have met the first three elements necessary for this court to issue an injunction.[2] Accordingly, the review of plaintiffs' positions looks only to whether their complaint and application for an injunction raises questions so serious, difficult, and doubtful so as to make the issues fair grounds for litigation such that a more deliberate investigation is needed. In doing so, the court has, however, kept in mind its discussion with counsel during the February 25, 2002 conference. There, counsel agreed that no facts were truly in dispute and that no additional facts were needed for the court to make its decision on plaintiffs' motion.

## B. Facts

The plaintiffs, to one degree or another, are all involved in the curbside pick up and disposal of refuse and/or recyclable materials in the City.[3] Doc. 1, ¶¶ 1, 7, 8, 10, 11, 12, and 14. Each plaintiff contracts directly with its customers to provide the agreed upon level of waste services. Doc. 5, ¶¶ 3, 6, and 7. There is no evidence that the City

---

**2.** *But see Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F.Supp.2d 174, 182 (E.D.N.Y. 2000) (rejecting plaintiff's argument that it was going to suffer irreparable harm to its reputation and goodwill due to a termination of contractual relations); *Barker Bros. Waste, Inc. v. Dyer County Legislative Body,* 923 F.Supp. 1042, 1048 (W.D.Tenn.1996) (rejecting plaintiff's assertion of irreparable harm because there was no evidence of an impending financial loss or ruin of its business).

**3.** The court notes that two of the plaintiffs are Kansas residents and two are not. The court will assume, without deciding, that all engage in interstate commerce and that some or all of the recyclable materials will be shipped outside Kansas, regardless of which company the City would have selected.

has ever provided such services to its residents for a fee.

For some time, the City has had a voluntary Saturday morning recycling program funded by the City and operated by volunteers of the "Bel Aire Recycling Committee." Doc. 10, ¶ 1. Under this Saturday morning program, homeowners, though not necessarily Bel Aire residents, bring recyclable goods to the City's recycling station where volunteers collect, sort, package, and ship the recyclable materials to an unspecified location outside of the City. Doc. 10, ¶ 1. Due to the growth of the program, the Saturday morning program has become unmanageable. Doc. 10, ¶ 2.

In June of 2001, in whole or in part in response to "encouragement" from the Board of Commissioners of Sedgwick County, Kansas, the City issued a request for proposals ("RFP") from those interested in collecting the City's residents' solid waste and recyclable materials. Doc. 5, ¶ 14. The City sought to contract with a single waste hauler for the exclusive right to service the residents. Doc. 5, ¶ 14; Doc. 10, ¶ 8. While all of the plaintiffs had an opportunity to submit bids pursuant to the RFP, only plaintiff Waste Connections, Inc. did so. Doc. 10, ¶ 8. During its August 7, 2001 City Council meeting, the City rejected all bids because they failed to comply with all of the RFP's terms and conditions. Doc. 10, ¶ 9. Nonetheless, the City Council took special notice of a bid submitted by South Central Recycling ("South Central"), a company from nearby Newton, Kansas. Doc. 10, ¶ 9. The City Council then directed city staff and the Bel Aire Recycling Committee to follow up with South Central to formulate a program, for adoption by the City Council,

under which the City of Bel Aire would contract with South Central for curbside recycling collection services within the corporate limits of the City. Doc. 10, ¶ 9.

To this end, the City Council, on January 22, 2002, unanimously adopted an ordinance ("the Ordinance") establishing a solid waste utility and a curbside recycling program that would be provided by a single contract recycling program hauler pursuant to a written contract with the City.[4] Doc. 10, ¶ 10. The Ordinance authorizes the City's administrator to negotiate an initial contract[5] with South Central but it does not specify that subsequent contracts must be exclusively with South Central. The Ordinance also does not require any of the City's residents to use South Central to dispose of their recyclable materials. Doc. 10, ¶ 10. Any recycling provider, including plaintiffs, can still contract directly with any or all of the City's residents to pick up their recyclable materials. Nothing in the Ordinance speaks to what can or should be done with the recyclable material after it is removed from the curbside.

The Ordinance authorizes the City to charge each household $4.00 per month. Doc. 5, ¶ 9. The $4.00 charge will be added to the water bill of each household within the City whether or not the household chooses to recycle and, if the household does recycle, whether or not the household chooses to do so with South Central. Doc. 5, ¶ 9. Failure to pay this $4.00 fee will result in the household's water being shut off by the City. Doc. 5, ¶ 9. In other words, while participation in the recycling program is voluntary, payment for such services is mandatory.

4. The significance of the establishment of a solid waste utility is not discussed by the parties. It is undisputed that the City has no landfill or any facility to collect and/or dispose of solid waste or recyclable materials.

In fact, the Ordinance does not address solid waste collection.

5. The contract, if signed, will run through 2002.

Plaintiffs allege that South Central will also provide "optional" trash or "solid waste" pick up as "an adjunct to its recycling business." Doc. 5, ¶ 12. Again, the City's residents are not required to utilize South Central for "solid waste" disposal. Those who do will be charged an additional $8.00 per month. Doc. 5, ¶ 12. Thus, residents of the City will be able to dispose of both their solid waste and recyclable material for approximately $12.00 per month, a fee substantially lower than the currently existing "free market" price apparently charged by plaintiffs. Doc. 5, ¶ 13.

## C. Overview of the Issues Presented

Plaintiffs claim that the City's adoption of the Ordinance violates various provisions of the United States Constitution. Doc. 5. Plaintiffs specifically assert that the Ordinance violates the negative component of the Commerce Clause and/or the Contracts Clause.[6] Doc. 16, pp. 4–9. Accordingly, this court will decide only whether plaintiffs are entitled to an order of this court enjoining the City from contracting with South Central because the Ordinance violates the dormant Commerce Clause and/or the Contracts Clause.

**6.** Plaintiffs have also alleged the Ordinance violates the Takings Clause and various state statutes. Doc. 16, p. 10. Plaintiffs have specifically stated that they do not base their request for an injunction upon the Takings Clause. Doc. 16, p. 10, n. 5. Accordingly, it is not considered herein.

In addition, the court, pursuant to 28 U.S.C. § 1367(c)(1), questions whether it should exercise jurisdiction over the state law claim because it raises novel and complex issues of Kansas law that would and should more appropriately be addressed to Kansas state courts. *See City of Chicago v. International College of Surgeons*, 522 U.S. 156, 174, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (stating that the exercise of supplemental jurisdiction is discretionary in nature); *Paper, Allied, Chemical and Energy Workers Int'l Union v.*

## II. ANALYSIS

### A. Dormant Commerce Clause

#### 1. Legal Framework

The Commerce Clause provides that Congress "shall have Power ... To regulate Commerce with foreign Nations, and among the several States." U.S. CONST. art. I, § 8, cl. 3. "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States [and their political subdivisions, *see Blue Circle Cement, Inc. v. Board of County Commr's*, 27 F.3d 1499, 1511 n. 13 (10th Cir.1994)] the power unjustifiably to discriminate or burden the interstate flow of articles of commerce."[7] *See Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). This implied restraint upon the states and its political subdivisions is often referred to as the "dormant" aspect of the Commerce Clause. *See American Target Advertising, Inc. v. Giani*, 199 F.3d 1241, 1254 (10th Cir.2000). Dormant Commerce Clause jurisprudence does not affect state or local regulations that are directly authorized by Congress but does "act[ ] as a brake" on the states'

*Slurry Explosive Corp.*, 107 F.Supp.2d 1311, 1327 (D.Kan.2000) (recognizing supplemental jurisdiction is discretionary); *Guseman v. Martinez*, 1 F.Supp.2d 1240, 1262 (D.Kan. 1998) (recognizing that even when supplemental jurisdiction is proper, there are often countervailing factors that counsel against the exercise of such power). Accordingly, plaintiffs' motion for an injunction based upon these claims is deferred pending receipt of the parties' memoranda showing cause why, or why not, the court should exercise supplemental jurisdiction.

**7.** The parties, like this court, assume that the collection and disposal of recyclable waste is an article of commerce. *Cf. C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994).

authority to regulate in areas where Congress has not affirmatively done so. *See Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 184 (1st Cir.1999).[8]

■■■ To determine whether an ordinance violates the dormant Commerce Clause, this court must make two separate inquiries. First, the court must determine whether the City, by passing the Ordinance, is regulating the market or simply participating in the market. *See USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272, 1281 (2d Cir.1995). In the event the City is merely participating in the market, it is "engaging in 'market participation' that by definition falls outside the scope of activity governed by the dormant Commerce Clause." *USA Recycling, Inc.,* 66 F.3d at 1281 (citing *Reeves, Inc. v. Stake,* 447 U.S. 429, 436–39, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980)). If, on the other hand, the City is regulating the market, this court must make a second inquiry: whether the Ordinance "regulates evenhandedly to effectuate a legitimate local public interest," *see Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), or instead " 'discriminates against interstate commerce' either on its face or in practical effect," *see American Target Advertising, Inc. v. Giani,* 199 F.3d 1241, 1254 (10th Cir.2000) (quoting *Oregon Waste Sys., Inc.,* 511 U.S. at 99, 114 S.Ct. 1345). *See also United Haulers Assoc., Inc. v. Oneida–Herkimer Solid Waste Management Auth.,* 261 F.3d

245, 255 (2d Cir.2001) *cert. denied* —— U.S. ——, 122 S.Ct. 815, 151 L.Ed.2d 699 (2002) (citing *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) and *Gary D. Peake Excavating v. Town Bd. of Hancock,* 93 F.3d 68, 73 (2d Cir.1996)). The determination of which side of the discriminatory/non-discriminatory line a regulation falls upon is a nearly infallible indicator of whether it will be upheld under a dormant Commerce Clause challenge. *See, e.g., Blue Circle Cement, Inc. v. Board of County Commr's,* 27 F.3d 1499, 1511 (10th Cir.1994) (citing *City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)) (stating that where simple economic protectionism is found, a virtually *per se* rule of invalidity arises).

### 2. Market Participant Doctrine

The City argues that its Ordinance is immune from plaintiffs' dormant Commerce Clause challenge because it is a market participant and may therefore choose the recycling company of its liking, whether or not that decision is discriminatory. Doc. 10, p. 12. The market participant doctrine is essentially a judicially-created exception to the dormant Commerce Clause jurisprudence which, as just noted, ordinarily prohibits a state or municipality from discriminating or impeding interstate commerce through protective

---

**8.** As will soon become evident, the court relies, sometimes exclusively, upon cases from other jurisdictions, including the First, Second, Third, and Eighth Circuits. For whatever reasons, these Circuits, unlike the Tenth Circuit, have had more than their "fair share" of "garbage" cases "clogging" their docket. *See United Haulers Assoc., Inc. v. Oneida–Herkimer Solid Waste Management Auth.,* 261 F.3d 245, 252–53 (2d Cir.2001) *cert. denied* —— U.S. ——, 122 S.Ct. 815, 151 L.Ed.2d 699 (2002). While obviously not binding upon this court, they are, for the most part,

representative of the "cutting edge" of the ever-evolving dormant Commerce Clause theory. *See* Stanley E. Cox, *Garbage In, Garbage Out: Court Confusion about the Dormant Commerce Clause,* 50 OKLA. L. REV. 155, 156, 158 (1997) ("The number of garbage decisions alone is significant. Garbage in fact seems to have replaced milk or minnows as today's primary subject for dormant Commerce Clause dispute."). As such, this court will give substantial deference to these decisions, given the lack of Tenth Circuit authority on the matter.

regulations. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 592, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (referring to the market participation doctrine as an exception to the dormant Commerce Clause); *Reeves, Inc. v. Stake,* 447 U.S. 429, 436–37, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) (noting the Commerce Clause "responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace"). It is a doctrine consistent with the goal of promoting free trade throughout the national market because, as the Court noted, "[t]here is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." *Reeves,* 447 U.S. at 437, 100 S.Ct. 2271 (citing L. Tribe, American Constitutional Law 336 (1978)); *see also Barker Bros. Waste, Inc. v. Dyer County Legislative Body,* 923 F.Supp. 1042, 1053 (W.D.Tenn.1996) ("The reason for the market participation exception is clear: the Commerce Clause only withholds from the states the power to 'regulate' interstate commerce and therefore does not affect other state actions that may impact interstate commerce.").

■ In order for the market participant doctrine to apply, this court must be satisfied that two important facts are present: (1) the Ordinance relates primarily to the City's participation in the marketplace rather than to its taxing and/or regulatory measures; and (2) the City's control or discrimination must occur in the narrow market within which the City is participating. *See Barker Bros. Waste,* 923 F.Supp. at 1054 (citing *Reeves, Inc. v. Stake,* 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) and *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 97–98, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984)). Plaintiffs primarily contend that the City's addition of the $4.00 solid waste fee onto the water bill to pay for the contract with South Central does not constitute market participation, but rather is an act of market regulation and/or taxation. Doc. 16, p. 5.

### 3. *Application*

Applying the market participation doctrine is a difficult task because the distinction between permissible participation and impermissible regulation and/or taxation is often confounding to both courts and scholars alike. *See, e.g.,* 1 Laurence H. Tribe, American Constitutional Law 1091 (3d ed. 2000) ("Indeed, the line between market participation and market regulation, which was less than pellucid even in *Alexandria Scrap,* has if anything been further obscured since." (footnote omitted)); John E. Nowak & Ronald D. Rotunda, Constitutional Law 307 (5th ed.1995) (discussing the difficulties encountered in this arena). Further producing difficulties is the fact that neither the parties nor this court have located any case that is "on point" with respect to facts of this case. For example, many of the cases relied upon discuss "flow control" ordinances that essentially seek to manage or dictate the waste stream. *See, e.g., Barker Bros. Waste, Inc. v. Dyer County Legislative Body,* 923 F.Supp. 1042 (W.D.Tenn.1996). These cases, though instructive on the general parameters of the market participant doctrine, do not dictate a particular result here because the Ordinance is clearly not an attempt by the City to control the flow of recyclable material either within or beyond the City. In addition, the cases analyzing the manner in which unique natural resources are utilized are similarly inapposite. *See, e.g., Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 576 n. 9, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (collecting cases where scarce natural resources were at issue, including *Philadelphia v. New Jersey,* 437 U.S. 617, 627, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), where the court discussed the fact that a

landfill may be considered a natural resource). Unlike these cases, the Ordinance does not involve the hoarding or regulation of a scarce resource. Instead, the Ordinance only sets forth a method by which the City pays South Central to collect the recyclable material from all residents who choose to recycle. As such, the "natural resource" cases are only marginally instructive.

Against this legal backdrop, this court must determine whether the Ordinance signifies only the City's entrance into the market or rather evinces an effort to regulate a market. In order to accomplish this goal, several established rules will be considered and applied to the situation presented by the parties. In the end, the court finds that plaintiffs' complaint and motion, along with the undisputed facts, do not present issues that would justify granting a preliminary injunction pursuant to the dormant Commerce Clause.

### a. The City May Contract To Buy Municipal Services

First, the court notes that several cases have recognized that a City may hire a private entity to provide needed municipal services without the constraints of the dormant Commerce Clause. *See USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1289 (2d Cir.1995). Accepting this rule, the court in *Barker Bros.* opined, albeit hypothetically and in dicta, that the rule also extended to the collection of garbage. *See Barker Bros. Waste, Inc. v. Dyer County Legislative Body*, 923 F.Supp. 1042, 1055 (W.D.Tenn.1996) (citing *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1289 (2d Cir.1995)). Assuming, *arguendo*, there exists a meaningful

distinction between the collection of garbage and the collection of recyclable material, the court nonetheless is convinced that the Ordinance falls within the general rule stated by the Second Circuit in *USA Recycling*.[9]

Even assuming that the City's recycling program is not a "needed" municipal service, the rule set forth by *USA Recycling* remains valid. For example, the Supreme Court, in *White v. Massachusetts*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), applied the market participant doctrine to the city of Boston in light of Boston's policy that required *all* construction projects funded by the city of Boston to be performed by a work force consisting of at least 50% Boston residents. *See White*, 460 U.S. at 214–15, 103 S.Ct. 1042. As noted by the Court in the subsequent case of *Camps Newfound/Owatonna*, *White* and other cases stand for the proposition that "a State acting in its proprietary capacity as a purchaser ... may 'favor its own citizens over others.'" *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 592–93, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997). Indeed, the Court in *Hughes* couched its holding in sweeping terms: "Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (footnote omitted). Without such congressional action, the City, when deciding to hire a private entity to provide

---

9. The Second Circuit in *USA Recycling* observes that "[f]or ninety years, it has been settled law that garbage collection and disposal is a core function of local government in the United States." *USA Recycling, Inc. v.* *Town of Babylon*, 66 F.3d 1272, 1275 (2d Cir.1995). The argument certainly can be made that, in the twenty-first century, recycling is, or will become, as important as garbage collection.

municipal services, may exercise any rights ordinarily afforded private citizens.

■ This court concludes that the City, acting as a purchaser of curbside recycling services for its citizenry, may act, like any other private citizen or entity, without the constraints of the dormant Commerce Clause. *See Reeves, Inc. v. Stake,* 447 U.S. 429, 438–39, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) (recognizing the State, when merely participating in the economy, should share the same freedoms of from federal constraints as those enjoyed by private traders or manufacturers who are engaged in wholly private business).

b. The $4.00 Charge Does Not Tax Or Regulate Plaintiffs' Business

■ The dormant Commerce Clause acts as a barrier only to state or municipal regulation and/or taxation of free private trade in the national marketplace. *See White v. Massachusetts,* 460 U.S. 204, 207, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) (quoting *Reeves, Inc. v. Stake,* 447 U.S. 429, 436–37, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980)). As defendant notes, the Supreme Court Reporter is filled with cases finding that tax exemptions or tax subsidies do not constitute market participation but rather are the sort of "primeval government activity" that falls outside the scope of the market participation doctrine. *See New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 277–78, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988) (finding the state of Ohio's tax scheme that gave a tax credit to ethanol producers from Ohio and states that granted a similar reciprocal tax credit to Ohio producers was not an exercise of a market participant but rather was a "primeval governmental activity" that no ordinary consumer could exercise); *Wisconsin v. Gould Inc.,* 475 U.S. 282, 289, 106 S.Ct.

1057, 89 L.Ed.2d 223 (1986) (finding the state was a market regulator, not a participant, when it prohibited state purchases from repeat labor law violators because such action "was tantamount to regulation"); *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 94, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (holding that Alaska's restrictions on the export of unprocessed timber from state-owned lands constituted market regulation). Here, unlike those cases, the City's Ordinance does not, in any manner, attempt to tax or regulate the business of curbside recycling collection in particular or solid waste collection and disposal in general. The City is neither taxing the plaintiffs nor regulating their collection or disposal of recyclable waste. Instead, the Ordinance only authorizes the City to enter into a contract that pays South Central to collect, from those residents choosing to engage in recycling activities, recyclable material. The Ordinance does not tax the recyclable material or attempt to regulate where or in what manner South Central (or plaintiffs) disposes of such materials. The Ordinance simply makes a service available to City's residents.

■ Plaintiffs attempt to bring the Ordinance within the confines of the taxation cases by suggesting that the City's implementation of the $4.00 charge on each resident's bill to pay for the added service is an impermissible attempt to tax and/or regulate the market, not participate in the market.[10] Doc. 16, p. 5. While the argument certainly has the dreaded "tax" word in it, a closer inspection reveals the innocuous nature of the City's efforts. Unlike those cases finding that a state or municipality was not a market participant because it taxed or regulated an industry,

---

**10.** Plaintiffs have failed to set forth any reason why they would have standing to challenge a tax upon the City's residents.

the City here has imposed no tax or regulation upon any of the plaintiffs. Instead, the City, to use plaintiffs' phraseology, "taxes" its residents to support a program the City believes will benefit the community. Plaintiffs have failed to cite any case suggesting that the City cannot impose a "tax" or "fee" upon its residents to pay for additional municipal services. Indeed, the cases discussed above indicate that, at the very least, the purchasing of services from existing municipal coffers is quite permissible. *See, e.g., White v. Massachusetts,* 460 U.S. 204, 205–206, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) (noting that construction projects were paid for with "city funds"); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 809, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (noting that the state of Maryland used "state funds" to pay a bounty for the removal of automobile "hulks"). If such expenditures of public funds are appropriate for the purchase of a good or service, it would be illogical to assume (or hold, as plaintiffs evidently would like this court to do) that the City cannot charge its residents an additional $4.00 on their water bills. Moreover, the fact that the recycling program is voluntary does not change the situation. The City's power to tax its residents, as opposed to plaintiffs, does not implicate any dormant Commerce Clause issues.

### c. The Ordinance Does Not Regulate Or Tax The Business Of Curbside Recycling Programs

Plaintiffs also argue that the $4.00 fee somehow inhibits or regulates interstate commerce. Doc. 16, p. 4. Contrary to plaintiffs' position, the Ordinance does not "regulate" the recycling business. As noted, the Ordinance does nothing to impede the free flow of interstate commerce because the City's residents are able to freely contract with any provider other than South Central, even including plaintiffs. While the court is cognizant that it may be economically wiser for the City's residents to utilize the City-provided service, the Ordinance in no way prohibits the residents from using any other recyclable material collection entity. Similarly, the Ordinance does not regulate or impact, in any way, the flow of recyclable materials.

### d. *C & A Carbone* And Its Progeny Are Not Applicable Because The City Is A Market Participant

Finally, the court must address an additional dormant Commerce Clause argument raised by plaintiffs. Initially, plaintiffs requested the injunction on the basis of the Supreme Court's holding in *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). Doc. 5, p. 12–13. Because this court has determined that the City is a market participant, *C & A Carbone* and its holding that discriminatory regulations are *per se* in violation of the dormant Commerce Clause, *see* 511 U.S. at 393, 114 S.Ct. 1677, is simply not relevant to the City's Ordinance, *see* Dan T. Coenen, *Untangling The Market–Participant Exception To The Dormant Commerce Clause,* 88 Mich. L.Rev. 395, 405 (1989) (stating that under the "ordinary" dormant Commerce Clause jurisprudence an almost *per se* rule of invalidity arises when discrimination exists but that the market participation exception erects a similar *per se* rule of validity when the state is a market participant). *See also Buchwald v. University of New Mexico Sch. of Medicine,* 159 F.3d 487, 496 n. 9 (10th Cir.1998) (citing *Reeves, Inc. v. Stake,* 447 U.S. 429, 436–39, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980)) ("The University of New Mexico's educational activities constitute participation in the market for educational services, not regulation of that market. Thus the policies in question fall under the

"market participant" exception to the dormant Commerce Clause.").[11] The rationale behind the market participant doctrine discloses as much: "where a State acts as a participant in the private market, it may prefer the goods or services of its own citizens, even though it could not do so while acting as a market regulator." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 685, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). Thus, even assuming plaintiffs

could show discrimination exists in the Ordinance, *C & A Carbone* is inapplicable.

### 4. Summary

 In the end, the court finds that there is a substantial likelihood that the City, in passing the Ordinance which gives the exclusive right to collect recyclable material within the City, acted not as a market regulator but rather as a market participant.[12] As a market participant, the City is free to choose whichever provider it

---

**11.** In *Blue Circle Cement, Inc. v. Board of County Commissioners,* 27 F.3d 1499 (10th Cir.1994), the Tenth Circuit criticized and reversed the district court for failing to consider the fact that a legislative prerogative, even if it is not facially discriminatory, may nonetheless violate the dormant Commerce Clause if its burden on interstate commerce is excessive in relation to the local benefits. *See Blue Circle Cement,* 27 F.3d at 1511. While the district court there erred in failing to consider the other prong of the dormant commerce clause analysis, this decision could be read to suggest alternative holdings are favored. Whether or not this is true, it is certainly the more cautious approach. Accordingly, this court notes that it has fully considered plaintiffs' argument that the Ordinance is not the City's entrance into the market but rather an example of its efforts to regulate or burden the market. Doc. 5, p. 13–15.

As an initial matter, the court finds that the Ordinance does not facially discriminate against out of state interests. *See Blue Circle Cement, Inc. v. Board of County Commr's.,* 27 F.3d 1499, 1511 (10th Cir.1994); *see also Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (stating the burden to show discrimination rests upon the party challenging the validity of the statute). As such, plaintiffs must point to some evidence indicating that the Ordinance "imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.' " *Id.* (citation omitted). Construing plaintiffs' arguments in the light most favorable to finding a burden on interstate commerce, the court is not convinced that plaintiffs have shown a substantial likelihood of establishing that those burdens are "clearly excessive" in relation to the benefits the City will receive by hiring a single contractor to

collect recyclable materials from its residents. *See United Waste Systems of Iowa, Inc. v. Wilson,* 189 F.3d 762, 768 (8th Cir.1999) (Hansen, J.) (upholding the regulatory scheme because "the effect of the regulation on interstate commerce is at most incidental and more likely nonexistent" such that it did not outweigh the local benefit of tracking and controlling waste just "because two frustrated local companies" failed to convince the governments to patronize them); *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272, 1287 (2d Cir.1995) (concluding that the Towns efforts to license only selected trash haulers constituted regulation but upholding such regulation because "[a]lthough Babylon's takeover of the local commercial garbage market may have some relatively minor effects on both interstate and local commerce, it will not impose any different burdens upon nonlocal as opposed to local garbage haulers"); *A.G.G. Enters., Inc. v. Washington County,* 145 F.Supp.2d 1215, 1226 (D.Or. 2001) (upholding the ordinance under *Pike* because the "burden imposed on interstate commerce is not clearly excessive in relation to the local benefits"); *Barker Bros. Waste, Inc. v. Dyer County,* 923 F.Supp. 1042, 1052–53 (W.D.Tenn.1996) (upholding the decision of the County because, *inter alia,* the County articulated no preference towards local providers, was guided by an economic desire to get the lowest bidder, and the five-year term of the contract was not excessive).

**12.** As noted, *supra,* the *Barker Bros.* test also requires proof of participation in the narrow market. This court is confident that the City's exercise of power within the confines of its relatively area of incorporation is sufficiently "narrow." Doc. 5, ¶ 3 (noting there are "over 2000 residential units" within the City).

wishes. Accordingly, there is little, if any, likelihood that plaintiffs can establish the Ordinance violates the dormant Commerce Clause. For this reason, an injunction based upon the dormant Commerce Clause will not issue.

## B. Contracts Clause

### 1. Legal Framework

According to the literal language of the Contracts Clause, "No State shall ... pass any ... Law impairing the Obligation of Contracts ...." U.S. CONST. art. I, § 10, cl. 1; *see also Western Univ. Assoc. v. City of Kansas City,* No. 93–2444–GTV, 1994 WL 171394, at *5 (D.Kan. Apr.8, 1994) (stating this also extends to "municipal legislation which is passed under supposed legislative authority from the state"). Though it was intended to ensure that private citizens can freely arrange their affairs without subsequent governmental interference, *see Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 245, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), it "is not, however, the Draconian provision that its words might seem to imply," *Allied Structural Steel,* 438 U.S. at 240, 98 S.Ct. 2716. Rather, the jurisprudential test that has evolved attempts to balance the magnitude of the alleged infringement in light of the valid prerogatives of the state and municipal governments. *See In re Walker,* 959 F.2d 894, 899 (10th Cir.1992); *Aves v. Shah,* 914 F.Supp. 443, 447 (D.Kan.1996) *aff'd* 124 F.3d 216, 1997 WL 589177 (10th Cir.1997).

▇▇▇ The touchstone of the judicial inquiry is whether a state or municipal law "has 'operated as a substantial impairment of a contractual relationship.'" *General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (quoting *Allied Structural Steel,* 438 U.S. at 244, 98 S.Ct. 2716). This inquiry, as stated by Justice O'Connor in *Romein,* has three components that plaintiffs must show in order to prevail: (1) there must be an existing contractual relationship; (2) the change in the law must have impaired that relationship; and (3) the impairment must have been "substantial" or severe. *See Renaud v. Wyoming Dep't of Family Servs.,* 203 F.3d 723, 728 (10th Cir.2000) (citing *General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992)). The first two inquiries are often easily satisfied, *see Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 190 (1st Cir.1999), as would appear to be the case here, Doc. 5, ¶¶ 6, 9. As such, the only remaining inquiry is whether or not the Ordinance "substantially impaired" plaintiffs' existing contractual rights.

### 2. Application

#### a. The Ordinance Imposes No "Substantial Impairment"

"In order to weigh the substantiality of a contractual impairment, courts look long and hard at the reasonable expectations of the parties." *Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 190 (1st Cir.1999). For example, those doing business in a heavily regulated industry have a diminished expectation of being free from government regulation of their contracts. *See, e.g., Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) ("The Court long ago observed: 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.'" (citation omitted)). Judge Van Bebber, of this court, has held that the "waste collection industry," which this court concludes encompasses the collection of recyclable materials, is one of these "heavily regulated" industries. *See Western Univ. Assoc. v. City of Kansas City,* No. 93–2444–GTV, 1994 WL 171394,

at \*6 (D.Kan. Apr.8, 1994) (finding that the plaintiff was aware that the refuse industry "was subject to significant governmental regulation, from both the state and local levels"); *see also Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 190 (1st Cir.1999) ("While Faulkner and his garbage collection customers did business for many years uninhibited by any regulation precisely akin to the 1997 Ordinance, they would have had to be troglodytes [13] not to have known that the waste collection and disposal industry is subject to fairly pervasive regulation.").

■ Applying this standard to the City's Ordinance, the court finds that there is a high probability that the Ordinance does not "substantially" impair plaintiffs' pre-existing contracts. First, it is clear that the Ordinance will not and does not invalidate any of plaintiffs' existing contracts. While the Ordinance may cause some customers not to renew their existing contracts with some of the plaintiffs, the Ordinance in no way prohibits the City's residents from continuing their existing contracts. Moreover, the nature of the waste industry makes the impact almost inconsequential because no reasonable entity engaged in the waste disposal business could have expected its contracts to exist in perpetuity. *See Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 190 (1st Cir.1999) (declining to answer whether a similar exclusive rights contract substantially impaired existing contracts because the question was "close" but noting that the heavy industry regulations "should have led [the waste disposal company] to realize that [its] collection contracts could not be maintained *ad infinitum* "); *Western Univ. Assoc. v. City of Kansas City,* No. 93–2444–GTV, 1994 WL 171394, at \*6 (D.Kan. Apr.8, 1994) (rejecting a Contracts Clause claim from an entity which had contracted to receive lease payments after the landfill had opened because there was a degree of uncertainty as to whether or not the landfill would ever be used, due in part to the potential for government regulations). Because the contracts identified by plaintiffs are fairly "short-term" Doc. 5, ¶ 6, the Ordinance, even if it does impair the contracts, does not *substantially* impair the contractual relationship.

b. The Ordinance Is Justifiable In Light Of Its Legitimate Interests And Method Of Attaining That Goal

■ Even assuming the impairment "substantially impaired" existing contracts, the City's exercise of its inherent authority to create conditions beneficial to its residents is justifiable. When a law is found to "substantially impair" existing contractual obligations, it may still survive a Contracts Clause challenge if it (1) is supported by a legitimate public purpose and (2) the adjustment of the existing contractual rights is based upon reasonable conditions of a character appropriate to the public purpose behind the law's adoption. *See Walker v. Mather,* 959 F.2d 894, 899 (10th Cir.1992) (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)).

■ The court finds that the City's goal of providing an economically-viable curbside recycling program to all of its residents is consistent with the jurisprudence discussing whether or not a purpose is "legitimate." *See, e.g., Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 412, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (stating that the problem need not be temporary or an emergency but can simply remedy "a broad and general social or economic problem");

---

**13.** A "troglodyte" is a "member of a fabulous or prehistoric race of people that lived in caves, dens, or holes." THE AMERICAN HERITAGE DICTIONARY 1917 (3d ed.1996).

*Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 243, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (citing *Home Building & Loan Assoc. v. Blaisdell,* 290 U.S. 398, 445, 54 S.Ct. 231, 78 L.Ed. 413 (1934), where the Court upheld a Minnesota law against a Contracts Clause attack because the law, which provided relief to homeowners threatened with foreclosure, was enacted to protect a basic societal interest); *Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 191 (1st Cir. 1999) (finding an ordinance which ensured the provision of reliable collection of waste was a legitimate purpose because the health and safety of a city's residents are "two mainstays of the police power"); *In re Walker,* 959 F.2d 894, 899 (10th Cir. 1992) (finding the State of Oklahoma's desire for providing income for a bankrupt debtor's families' needs was a significant and legitimate purpose). Similarly, the "adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 412, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).

The method in which the City has acted appears to be consistent with its desire to provide a uniform system of a curbside recycling to all of its citizens. As noted, the City initially provided all interested parties an opportunity to submit competing bids to effectuate its goal. When it found no bids to its liking, the City then chose the candidate it felt most closely could meet the goal. Moreover, upon identifying South Central as the entity it wanted to be the exclusive provider, the City did not prohibit curbside collection of recyclable waste within the City by other companies.

Plaintiffs argue that the legitimate interests could be accomplished in "another,

less intrusive manner." Doc. 16, p. 9. Even assuming this is possible, plaintiffs have set forth no authority, nor is the court aware any such authority exists, for the proposition that the City's decision must be the least intrusive option or must survive an invasive, "rational-basis" type test. In fact, there is some authority that the legislative prerogatives and methods used to implement these goals should be given substantial deference by the courts. *See Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 191 (1st Cir.1999) (deferring to the Town's judgment where the Ordinance essentially made existing contracts redundant with the public service the Ordinance provides). While this level of deference would not be appropriate if the City had used its legislative power to avoid a contract it had previously entered into with a private party, *see Energy Reserves Group, Inc. v. Kansas Power & Light ·Co.,* 459 U.S. 400, 412–13 & n. 14, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the Ordinance does not invalidate or hinder the City's obligations. The City's actions, therefore, are not subject to second-guessing by either this court or plaintiffs. *See Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 191 (1st Cir.1999) (deferring to the Town); *In re Walker,* 959 F.2d 894, 900 (10th Cir.1992) (deferring to the Oklahoma legislature because the court cannot "substitute [its] judgment for that of the Oklahoma legislature").

### 3. Summary

After reviewing plaintiffs' Contracts Clause challenge to the Ordinance, the court finds that plaintiffs have failed to identify issues so substantial or difficult to necessitate preserving the status quo. Specifically, it does not appear likely that plaintiffs will prevail upon their Contracts Clause claim because the City's Ordinance does not substantially impair plaintiffs existing contracts and, even assuming it did,

the Ordinance is justifiable in light of the City's governmental interests. Accordingly, an injunction based upon the Contracts Clause will not issue.

### III. CONCLUSION

For the preceding reasons, the court DENIES plaintiffs' motion for an injunction based upon federal constitution grounds. The Court defers the exercise of jurisdiction over the state law claim raised by plaintiffs until the parties have had an opportunity to show cause why the court should exercise its discretion to consider this claim.

IT IS SO ORDERED.